UNITED STATES of America, Plaintiff–Appellant, Cross–Appellee,

Alabama Department of Environmental Protection and State of Alabama, Intervenors–Plaintiffs–Appellants, Cross–Appellees,

v.

ILCO, INCORPORATED, a/k/a Interstate Lead Company, Inc. and Diego Maffei, Defendants–Appellees, Cross–Appellants,

Leeds Excavating & Paving Company, Inc., et al., Defendants.

No. 91–1004.

United States Court of Appeals, Eleventh Circuit.

Aug. 4, 1993.

tion by resort to sources whose accuracy cannot reasonably be questioned."

Alton B. Parker, Spain, Gillon, Grooms, Blan & Nettles, Birmingham, AL, for State of Alabama.

Katherine Adams, U.S. Dept. of Justice, Washington, DC, for U.S.

Charles de Saillan, U.S. E.P.A., Washington, DC, for appellees.

Charles R. Driggars, Sirote & Permutt, Birmingham, AL, for ILCO, Inc.

John A. Bryson, M. Alice Thurston, U.S. Dept. of Justice, Appellate Section, Washington, DC, for appellants.

Before FAY and DUBINA, Circuit Judges, and FLOYD R. GIBSON *, Senior Circuit Judge.

FAY, Circuit Judge:

This case is an enforcement action filed by the United States Environmental Protection Agency and the State of Alabama against a secondary lead smelter for violations of federal and state environmental law. The district court held the defendant liable and awarded civil penalties and cleanup costs to the government, and ordered compliance with the law. Although the government received a favorable decision, it has appealed the district court's conclusion that the lead components reclaimed from spent batteries are raw materials. The district court reasoned that because the smelter recycles the components into lead ingots, the components must be raw materials, and not hazardous waste subject to the provisions of the Resource Conservation and Recovery Act. The

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

defendant has cross-appealed the district court's order awarding penalties and cleanup costs to the government. Because we find the district court's order well founded in fact and law, we affirm it in all but one respect. We reverse the court's conclusion regarding the lead components reclaimed from spent batteries because EPA, in accordance with its authority granted by Congress, has defined "discarded material" to include "recycled material."

## BACKGROUND

### 1. Industry Overview [1]

Over the years in the United States there has been a steady increase in the number of vehicle batteries which become useless and subject to disposal. In 1986 the number stood at approximately 70,000,000. Each spent battery is a potential pollutant of the environment and can have serious deleterious effects on people and animals living in the area where the battery may be discarded. Even a small number of batteries thrown into the woods, discarded along roadways or in government designated garbage areas represent a significant threat to the water we drink, the food we eat and under limited circumstances, the air we breathe. The source of this trouble in a battery is lead.... [Because lead is an expensive element, an industry has developed over the years] to reclaim the lead from spent batteries.... [In the mid-Seventies] there were approximately 50 secondary lead smelters in the United States reclaiming the lead from about 90% of all spent batteries. The smelters were themselves a major source of pollution; surface water run-off and process water discharged by the smelters created very real health-threatening problems; on-site and off-site storage or disposition of waste became an increasing risk to the quality of life; and even the air was dangerously polluted by emissions from the smelters. [In response to these problems] all levels of government began to amend existing laws and to enact new laws

and regulations placing much greater controls over ownership and operation of such smelters. Compliance with these new environmental laws and regulations ... placed such a financial burden on the operation of secondary lead smelters that about 60% of the smelters operating in 1976 were out of business by 1986, and the approximately 20 smelters remaining were reclaiming only about 70% ... [of all discarded batteries.] Thus in 1986 only 55,000,000 of the available 70,000,000 batteries were reclaimed, leaving the 15,000,000 unreclaimed spent batteries to endanger the health of all persons near the site of their repose. The 55,000,000 reclaimed batteries produced about 60% of all lead used in the United States.... [This brief overview demonstrates the secondary lead smelting industry] is a most vital industry not only to our economy but also to [our] environment.... Without the industry, over 70,000,000 contaminated batteries would be scattered throughout our country annually. [Nevertheless, the heart of this industry centers around the handling of hazardous materials. Exempting the industry from regulation cannot be justified on the theory that its contribution to resolving our environmental problems outweighs the environmental harm caused by its operations.]

### 2. Factual and Procedural Background

Against this industry backdrop the present case unfolds, spanning nearly a decade of interaction between the Environmental Protection Agency ("EPA"), the Alabama Department of Environmental Management ("ADEM") and Interstate Lead Company, Inc. ("ILCO"). The voluminous facts are very briefly set forth.

ILCO owned and operated a secondary lead smelting facility in Leeds, Alabama, from the 1960's until operations ceased in 1992. As such, it was one of the 20 smelters remaining in the country which reclaimed spent batteries. In 1986 ILCO reclaimed over 2,500,000 batteries, or about 5% of those

---

1. This concise description is quoted, in large part, from the district court's unreported opinion. *See United States v. ILCO*, 32 Env't Rep. Cas. (BNA) 1977, 1990 WL 300298 (N.D.Ala. 1990).

reclaimed in the United States. Diego Maffei is the president and majority shareholder of ILCO.

ILCO purchased batteries from various suppliers and placed them in a reclamation process. Incoming batteries were cracked open and drained of sulfuric acid. The rubber or black plastic battery boxes were chipped and washed to remove lead particles. The lead battery components known as "plates and groups" were then removed from the broken batteries and run through ILCO's smelting process to produce lead ingots for sale. The operation produced several waste products which were the subject of litigation in the district court: waste acid, wastewater treatment sludge, broken battery casings or "chips," and emission control dust and blast slag from the smelting process. EPA asserted, and continues to argue on appeal, that the reclaimed lead plates and groups were also waste products. The defendants viewed the plates and groups as raw materials essential to the lead recovery industry.

EPA and ADEM initiated this case as an enforcement action against ILCO and its president, Diego Maffei, seeking an injunction to curtail ongoing violations of environmental laws and regulations at ILCO's plant in Leeds and seeking penalties for past violations.[2] The amended complaint contained six claims, but two settled during trial. Of the four remaining claims, EPA first alleged ILCO violated the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1387, by improperly discharging waste water at or near the plant site in violation of its NPDES permit,[3] and subsequent to March 1984 without any permit.[4] The second and third claims concerned the treatment, storage and disposal of hazardous wastes since 1980 in violation of the Resource Conservation and Recovery Act ("RCRA"), as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901–92k. In the second claim EPA charged ILCO with maintaining storage areas, an incinerator and a treatment tank, all containing hazardous waste, in violation of regulations applicable to their status as an interim facility and maintaining other storage facilities and a landfill without the requisite permit.[5] The third claim encompassed the same RCRA violation, alleging that the facility permitted releases of hazardous waste into the environment. The fourth claim focused upon alleged violations of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–75, at a place known as "the Church of God site," located about six miles north of the plant. ILCO was charged with dumping hazardous waste in a ravine behind the Church of God, which released or threatened to release hazardous substances into the environment. Consequently, EPA sought recovery for the excavation costs incurred in removing the waste.

This appeal arises from a finding of liability against ILCO and Maffei under the CWA and the RCRA, and a judgment awarded to EPA for cleanup costs. The district court ordered the defendants (1) to pay a $3.5 million penalty for violations of RCRA, the

---

**2.** The original complaint was filed by EPA in March 1985. ADEM subsequently intervened, asserting similar claims under comparable state law. EPA and ADEM assert the same issue on appeal. In the interest of simplicity, therefore, we refer only to EPA and violations of federal law, which will include all claims made by ADEM for state law violations.

**3.** The Clean Water Act establishes a National Pollutant Discharge Elimination System ("NPDES") requiring a permit for discharge of any pollutant into waters of the United States. 33 U.S.C. § 1342 (1988).

**4.** ILCO's permit expired on January 27, 1982. The company did not submit a complete application for renewal until March 5, 1984, and withdrew that application on March 23, 1984. ILCO thereafter continued to discharge pollutants into state waters.

**5.** RCRA requires that facilities storing hazardous wastes apply for and obtain an operating permit which ensures adequate compliance with regulatory storage and handling procedures. *See generally* 42 U.S.C. §§ 6922–25 (1988). This permit requirement can be met by obtaining a permit issued by EPA or a state agency to which such authority has been delegated, *see* 42 U.S.C. § 6925(c)(1) and §.6926 (1988), or it can be satisfied by meeting the statutory criteria established by Congress for "interim status," which is the functional equivalent of a permit. 42 U.S.C. §§ 6925(a) and (e) (1988).

CWA and state laws,[6] (2) to attain compliance with the laws, and (3) to reimburse the United States $845,033 for prejudgment interest and response costs incurred by EPA in performing a cleanup at the Church of God. The court found the lead plates and groups to be solid waste as defined in 40 C.F.R. § 261.2 because they exhibit the characteristic of "Extraction Procedure toxicity" for lead and cadmium as defined in that regulation. However, the court also held the plates and groups at the ILCO facility were not "hazardous waste," accepting ILCO's argument that it did not "discard," but rather purchased the plates and groups as raw materials for the purpose of recovering lead values. EPA and ADEM appeal this ruling.[7]

## DISCUSSION

■■■ The sole question of law raised by EPA on appeal is whether lead parts, which have been reclaimed from spent car and truck batteries for recycling purposes, are exempt from regulation under RCRA. The standard of review is *de novo*. *Novak v. Irwin Yacht and Marine Corp.*, 986 F.2d 468, 470 (11th Cir.1993). Reviewing the interpretive decisions of an administrative agency is a two-step process: If Congress has clearly and directly spoken to the precise question at issue, effect must be given to the expressed intent of Congress. If the court finds the statute silent or ambiguous with respect to the specific issue, it must ask whether the agency's regulation is based on a "permissible" or "reasonable" construction of the statute. *Chevron USA, Inc. v. National Resources Defense Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Considerable weight and deference are afforded an agency's interpretation of a statute entrusted to its administration. *Id.* at 844, 104 S.Ct. at 2782.

Because Congress has not spoken to the precise question at issue, we must decide whether EPA has reasonably construed the

RCRA to permit regulation of the recycling of hazardous materials. There is no question that the materials at issue are hazardous; the district court specifically found the plates and groups were "Extraction Procedure toxic" for lead and cadmium. If it is permissible for EPA to determine that "solid waste," as defined by Congress, includes materials that are recycled, then the lead plates and groups were "hazardous waste" and must be managed accordingly. We conclude that EPA's regulations are a reasonable exercise of its authority granted by Congress. For this reason and those to follow, we find the lead plates and groups that ILCO reclaims from spent batteries fall squarely within the law and regulations governing the storage, disposal and treatment of hazardous waste.

The RCRA, as amended, 42 U.S.C. §§ 6901–92k (1988), is a comprehensive environmental statute, which grants EPA authority to regulate solid and hazardous wastes from "cradle-to-grave." *American Petroleum Institute v. EPA*, 906 F.2d 729, 732 (D.C.Cir.1990). "Congress' 'overriding concern' in enacting RCRA was to establish the framework for a national system to insure the safe management of hazardous waste." *American Mining Congress v. EPA*, 824 F.2d 1177, 1179 (D.C.Cir.1987) (AMC I). RCRA directs EPA to promulgate regulations establishing a comprehensive management system for hazardous wastes. 42 U.S.C. §§ 6921–39b (1988).

Before a material can be designated and regulated as a "hazardous waste," it must first be determined to be a "solid waste." *See* 42 U.S.C. § 6903(5) (1988). Solid waste includes:

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility *and other discarded material*, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commer-

---

6. The court awarded $2 million to the United States and $1.5 million to the State of Alabama.

7. ILCO has cross-appealed, claiming the district court erred in awarding EPA costs for the removal action at the Church of God site and in assessing penalties for violations of RCRA and CWA.

We have reviewed these arguments and the decision of the district court. The factual findings fully support the action ordered by the district court and the record, in turn, provides ample support for these findings; they warrant no further discussion.

cial, mining, and agricultural operations, and from community activities. . . .

42 U.S.C. § 6903(27) (1988) (emphasis added). 42 U.S.C. § 6921 directs the Administrator of the EPA to identify those solid wastes which are "hazardous" and whose management should therefore be governed by RCRA.[8] In particular, § 6921 requires the Administrator both to "promulgate criteria for identifying the characteristics of hazardous waste" and, using these criteria, to list "specific hazardous wastes." [9] *See American Petroleum*, 906 F.2d at 733.

Pursuant to its authority, EPA has promulgated regulations which specifically address discarded lead-acid batteries. Without clarifying the meaning of "discarded," Congress defined solid waste as "any discarded material" not otherwise exempted from regulation.[10] EPA has filled the statutory gap by defining "discarded material" as any material which is abandoned, recycled, or inherently wastelike. 40 C.F.R. § 261.2(a)(2) (1992). "Recycled material" refers to, inter alia, spent material which has been reclaimed. 40 C.F.R. § 261.2(c)(3) (1992). A material is "'reclaimed' if it is processed to recover a usable product, or if it is regenerated. Examples are recovery of lead values from spent batteries. . . ." 40 C.F.R. § 261.1(c)(4) (1992). "Reclaimed material" clearly includes lead values derived from the plates and groups at issue here. Furthermore, these battery components fall within the § 261.1(c)(4) definition of recycled material because ILCO runs the plates and groups through a smelting process to recover a usa-

ble product, lead, which is then cast into ingots and sold. Thus, having met the definition of "recycled," the lead components are discarded material as defined in 40 C.F.R. § 261.2(a)(2).

The regulations also specify those recycled materials which are solid wastes. They include "spent materials" that are recycled by "reclamation," or are "accumulated, stored, or treated before recycling" by reclamation. 40 C.F.R. § 261.2(c) (1992). A "spent material" is "any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing." 40 C.F.R. § 261.1(c)(1) (1992). Thus, the applicable regulations are unambiguous with respect to spent lead components used in a recycling process: spent materials "are solid wastes when reclaimed." 40 C.F.R. § 261.2(c)(3) and Table 1 (1992).

■ ILCO argues that it has never "discarded" the plates and groups and, therefore, the material it recycles is not "solid waste" as defined in RCRA § 6903(27). The lead plates and groups are, no doubt, valuable feedstock for a smelting process. Nevertheless, EPA, with congressional authority, promulgated regulations that classify these materials as "discarded solid waste." *Somebody* has discarded the battery in which these components are found. This fact does not change just because a reclaimer has purchased or finds value in the components.

The regulations reflect EPA's policy decision [11] that spent batteries, including their

---

8. We are not unmindful of the potential circularity generated by these interdependent definitions, that is, to be "hazardous waste" a material must first be defined as "solid waste," but the EPA has the authority to define materials destined for recycling as a subset of "solid waste." *See AMC I*, 824 F.2d at 1187 ("EPA's various arguments based on the statute itself are, upon analysis, circular, relying upon the term "solid waste" or "hazardous waste" to extend the reach of those very terms.").

9. Accordingly, the regulations define two categories of hazardous waste: "listed" waste and "characteristic" waste. Listed wastes are produced by a particular type of industrial process and are given a unique identifying code number. 40 C.F.R. § 261.30 (1992). Characteristic wastes are those wastes which exhibit certain characteristics of ignitability, corrosivity, reactiv-

ity or Extraction Procedure toxicity. 40 C.F.R. § 261.21–24 (1992).

10. Defendants do not claim to fall within any exception.

11. The EPA has interpreted plates and groups as solid waste under these regulations for five years. *See* 57 Fed.Reg. 960–61 (Jan. 9, 1992) ("With regard to lead plates and groups, the materials are solid wastes under the federal regulations because they are spent materials being reclaimed") and at n. 2 (citing prior agency actions and interpretive statements indicating that lead plates and groups are solid waste under the federal regulations.). The agency's application of its own regulation in this instance is entitled to substantial deference. *See, e.g., Borden v. Meese*, 803 F.2d 1530, 1535 (11th Cir.1986) ("Courts

lead components, became "part of the waste disposal problem," *AMC I,* 824 F.2d at 1186, when the original consumer discarded the battery. It is unnecessary to read into the word "discarded" a congressional intent that the waste in question must finally and forever be discarded, as ILCO seems to argue. It is perfectly reasonable for EPA to assume Congress meant "discarded once." Were we to rule otherwise, waste such as these batteries would arguably be exempt from regulation under RCRA merely because they are potentially recyclable. Previously discarded solid waste, although it may at some point be recycled, nonetheless remains solid waste. *See American Petroleum,* 906 F.2d at 741 (holding that "discarded" material sent by steel mills to a metal recovery facility remained a solid waste in the hands of the metal recoverer); and *American Mining Congress v. EPA,* 907 F.2d 1179, 1186–87 (D.C.Cir.1990) (AMC II) (materials awaiting recycling may be classified as "discarded," whether the materials were discarded by one user and sent to another for recycling, or stored before recycling by the person who initially discarded them in land disposal units). *Compare AMC I,* 824 F.2d at 1187, n. 14 (used oil collected and recycled by a reclaimer is "discarded" and subject to regulation) *with* 824 F.2d at 1184, 1190 ("materials retained [by the generating industry] for immediate reuse" or "passing in a continuous stream or flow from one production process to another" are not "discarded" within the meaning of RCRA). Therefore, we find these batteries and their contents are "discarded" within the everyday sense of the word. Their secondary character as recyclable material is irrelevant to that determination. *See AMC I,* 824 F.2d at 1192–93 and *AMC II,* 907 F.2d at 1186–87.

We have found nothing in the language of the statute, and ILCO has brought forth nothing from the legislative history to show that EPA's policy choice is not one Congress would have sanctioned. *See AMC II,* 907 F.2d at 1186. On the contrary, application of these regulations to spent batteries and parts generated by consumers comports with Congress' intent in RCRA to address the problems posed by hazardous waste. The House Committee explained:

> It is not only the waste by-products of the nation's manufacturing processes with which the committee is concerned: but also the products themselves once they have served their intended purposes and are no longer wanted *by the consumer.* For these reasons the term discarded materials is used to identify collectively those substances often referred to as industrial, municipal or *post-consumer* waste; refuse, trash, garbage and sludge.

H.R.REP. No. 1491, 94th Cong., 2d Sess. 2 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6240 (emphasis added). We, therefore, will not disturb an agency's policy choice that is reasonably consistent with the purpose of the statute. *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783.

### CONCLUSION

For the foregoing reasons, we REVERSE the district court's determination that the lead plates and groups are "raw materials" and hold they are "hazardous waste" subject to regulation under RCRA, but AFFIRM its decision in every other respect. The case is REMANDED for proceedings consistent with this opinion.

accord great deference to the interpretation of statutes and regulations by the agency charged with administering that regulatory scheme.").