OWEN ELECTRIC STEEL COMPA-
NY OF SOUTH CAROLINA, IN-
CORPORATED, Petitioner,

v.

Carol M. BROWNER, Administrator
of the United States Environmental
Protection Agency, Respondent.

No. 93–2195.

United States Court of Appeals,
Fourth Circuit.

Argued April 13, 1994.

Decided Oct. 12, 1994.

ARGUED: William Thomas Lavender, Jr., Davis & Lavender, P.C., Columbia, SC, for petitioner. Alice L. Mattice, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for respondent. ON BRIEF: Thomas G. Eppink, Davis & Lavender, P.C., Columbia, SC, for petitioner. Peter R. Steenland, Acting Deputy Asst. Atty. Gen., Environment and Natural Resources Div., U.S. Dept. of Justice, John Michaud, Office of Gen. Counsel, U.S.E.P.A., Washington, DC, Mary Butler, Office of Regional Counsel, U.S.E.P.A., Atlanta, GA, for respondent.

Before RUSSELL, WILKINSON, and HAMILTON, Circuit Judges.

Petition denied by published opinion. Judge RUSSELL wrote the opinion, in which Judge WILKINSON and Judge HAMILTON joined.

## OPINION

RUSSELL, Circuit Judge:

The sole issue in this case is whether the "slag" produced by petitioner Owen Electric Steel Company ("Owen") at its Cayce, South Carolina, facility as a byproduct of steel production is "discarded," and therefore constitutes a "solid waste" under 42 U.S.C. § 6903(27).

### I

The relevant facts are few and not in dispute. Owen is engaged in the production of steel. The steel is produced in an electric arc furnace. In the course of production, crushed limestone (calcium carbonate) is added to the furnace to remove certain non-ferrous constituents from the molten metal.[1] In this process, the non-ferrous constituents bind with the limestone, creating "slag", which is essentially limestone and dolomite (magnesium carbonate) with trace amounts of metallic oxides. The slag then floats to the surface of the molten metal and is removed.

The slag is continuously processed at the Owen's plant in Cayce by a third party contractor. Following processing, the slag is placed in holding bays, where the slag lies on bare soil for tempering and weathering. During this process, known as "curing", the slag is hydrated and undergoes phase changes where its bulk increases volumetrically. This curing process generally takes six months. After this time, the slag becomes dimensionally stable and, as a result, amenable for use as a construction aggregate. The slag generated at Owen's Cayce facility is sold to the construction industry for use as a road base material or for other commercial purposes.

### II

An operator of a facility that treats, stores, or disposes of hazardous wastes ("TSDF") is required to comply with various requirements set forth in the Resource and Conservation Recovery Act ("RCRA"), 42 U.S.C. § 6901–6992k, including seeking and obtaining a permit from the Environmental Protection Agency ("EPA")[2]. See RCRA § 3005, 42 U.S.C. § 6925. RCRA § 3004(u), 42 U.S.C. § 6924(u), requires that any TSDF permit mandate "corrective action for all releases of hazardous waste or constituents from any solid waste management unit" at the TSDF.

Because Owen's Cayce facility is a TSDF, Owen had to apply for and obtain an EPA permit for the facility. On October 6, 1989, Owen received by mail from the EPA a proposed permit which listed certain conditions pursuant to which the permit was issued, and the specific areas of the Cayce site

---

1. Failure to remove these constituents would adversely affect the finished steel.

2. In fact, under certain circumstances, a State can be given authority by the EPA to issue permits or portions of permits. Although South Carolina does have partial authority to issue portions of permits, the issue raised in this case relates to a permit issued by the EPA.

as to which the permit applied. The permit identified the slag processing area ("SPA") as a solid waste management unit ("SWMU").

In numerous administrative filings thereafter, Owen claimed that the SPA is not an SWMU. When, ultimately, the EPA adhered to its original determination and ordered further evaluation of the SPA, Owen filed the instant petition, naming Carol M. Browner, the EPA Administrator, as respondent.

### III

■ We must determine whether the EPA properly classified the SPA as an SWMU. In determining the criteria according to which a particular area is classified as an SWMU, the EPA, justifiably, looks to the legislative history underlying RCRA § 3004(u), which unequivocally states: "[T]he term 'solid waste management unit' [in amended RCRA § 3004] is used to reaffirm the Administrator's responsibility to examine all units at [a TSDF] from which hazardous constituents might migrate, irrespective of whether the units were intended for the management of solid and/or hazardous waste." H.R.Rep. No. 198, 98th Cong., 2d Sess., pt. 1, at 60 (1983), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5619. Accordingly, in order to conclude that the SPA is an SWMU, the EPA need only find that Owen's slag is a "solid waste."

■ RCRA § 1004 defines the term "solid waste" as

any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining and agricultural operations, and from community activities....

42 U.S.C. § 6903(27).[3] At issue is whether Owen's slag constitutes "other discarded material." Owen argues that its slag is not a "discarded material" because it is ultimately recycled and used in roadbeds. EPA counters that, because the slag lies dormant, exposed, on the ground for six months before such use, it is discarded even if it is later "picked up" and used in another capacity.

■ In evaluating these competing arguments, we accord the EPA's interpretation of statutory definition of "solid waste" substantial deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Pursuant to *Chevron,* the Court must first ask whether Congress has spoken directly to the issue in question. If it has, then Congress' directive displaces any contrary agency interpretation. If, however, as here, Congress has not directly spoken, then the Court will not invalidate the agency interpretation so long as it is reasonable and permissible. Additionally, we review the Administrator's permit dispositions only for abuse of discretion. *See* RCRA § 7006(b), 42 U.S.C. § 6976(b) (adopting the standard of review set out in the Administrative Proce-

---

**3.** An EPA regulation, 40 C.F.R. § 261.2, provides a more elaborate definition of "solid waste." However, 40 C.F.R. § 261.1(b)(1) explicitly cautions that "[t]he definition of solid waste contained [at 40 C.F.R. § 261.2] applies only to wastes that also are hazardous for purposes of the regulations implementing subtitle C of RCRA." While subtitle C of RCRA is codified at 42 U.S.C. §§ 6921–6939b and therefore, organizationally at least, contains section 6924(u), the statutory provision at issue herein, it is undisputed that, nonetheless, the regulatory definition of "solid waste" is inapplicable here. This is because, while subtitle C is generally directed to the regulation of hazardous wastes, SWMUs are, as explained in the text, subject to section 6924(u) regardless of whether the solid wastes they treat are also hazardous.

Despite the EPA's concession that the regulatory definition of "solid waste" is inapplicable

herein, the fact remains that the EPA's final Order makes explicit reference to the regulatory definition, *see* J.A. 3–5. Any error in this regard is of no moment, however, because the statutory definition of "solid waste", which *is* applicable here, is *broader* than the regulatory definition. *See Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.,* 989 F.2d 1305, 1315 (2d Cir.1993) (noting "the broader statutory definition of solid waste" as compared to the regulatory definition). We reject Owen's suggestion, acceptance of which would frustrate the underlying purposes of RCRA, that, although it "does not argue that a solid waste must be hazardous in order to be regulated as a SWMU," Petitioner's Br. 26, the EPA should be bound by its attempt to define Owen's slag as a solid waste under the regulatory definition.

dure Act, 5 U.S.C. §§ 701–706); 5 U.S.C. § 706(2)(A) (limiting judicial review of agency action to a determination of whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). In general, moreover, as we have repeatedly emphasized, " 'the authority [of the Administrator] to abate waste hazards is expansive.' " *Feikema v. Texaco, Inc.,* 16 F.3d 1408, 1415 (4th Cir.1994) (quoting *United States v. Waste Indus., Inc.,* 734 F.2d 159, 166 (4th Cir.1984) (alteration by the court in *Feikema* )).

A series of cases have addressed the meaning of "discarded material." In *American Mining Congress v. United States EPA,* 824 F.2d 1177 (D.C.Cir.1987) (*"AMC I"*), the District of Columbia Circuit was faced with the question of

> whether, in light of [Congress'] expressly stated objectives and the underlying problems that motivated it to enact RCRA in the first instance, Congress was using the term "discarded" in its ordinary sense— "disposed of" or "abandoned"—or whether Congress was using it in a much more open-ended way, so as to encompass materials no longer useful in their original capacity though destined for immediate reuse in another phase of the industry's ongoing production process.

*Id.* at 1185. The court of appeals settled upon the former option, emphasizing that it found the statutory language unambiguous. The court observed that the legislative history and policies underlying RCRA supported its conclusion. In the court's opinion, only materials that are "disposed of" or "abandoned" "become part of the waste disposal problem," *id.* at 1186, with which RCRA is concerned.

Were *AMC I* the final case offering interpretation of the phrase "discarded material," Owen might be victorious here: because Owen's slag is eventually recycled, it cannot be said to have been discarded. Subsequent cases, however, have read *AMC I* narrowly. First, in *American Petroleum Institute v. United States EPA,* 906 F.2d 729 (D.C.Cir. 1990), the EPA asserted that the District of Columbia Circuit's holding in *AMC I* precluded it from regulating as waste hazardous slag that was delivered to a plant for metal reclamation. The court of appeals held otherwise, explaining:

> . . . The issue in *AMC [I]* was whether the EPA could, under the RCRA, treat as "solid wastes" "materials that are recycled and reused in an *ongoing* manufacturing or industrial process." [*AMC I,* 824 F.2d at 1186.] We held that it could not because
>
> > [t]hese materials have not yet become part of the waste disposal problem; rather, *they are destined for beneficial reuse or recycling in a continuous process by the generating industry itself.*
>
> *Id.* Materials subject to such a process were not "discarded" because they were never "disposed of, abandoned, or thrown away." *Id.* at 1193.
>
> *AMC [I]* is by no means dispositive of EPA's authority to regulate K061 slag. Unlike the materials in question in *AMC [I],* K061 is indisputably "discarded" *before* being subject to metals reclamation. Consequently, it *has* "become part of the waste disposal problem". . . .

*American Petroleum Inst.,* 906 F.2d at 741 (emphasis provided by the *American Petroleum Inst.* court).

Next, in *American Mining Congress v. United States EPA,* 907 F.2d 1179 (D.C.Cir. 1990) (*"AMC II"*), petitioners, relying on *AMC I,* claimed that three hazardous wastes were not solid wastes on the basis that "sludges [containing the wastes] from wastewater that are stored in surface impoundments and that *may* at some time in the future be reclaimed are not 'discarded'." *AMC II,* 907 F.2d at 1186 (emphasis in original). The court of appeals rejected petitioners' reading of *AMC I,* stating:

> Petitioners read *AMC [I]* too broadly. *AMC [I]*'s holding concerned only materials that are "destined for *immediate reuse* in another phase of the industry's ongoing production process," *id.* at 1185 (emphasis added), and that "have not yet become part of the waste disposal problem," *id.* at 1186. Nothing in *AMC [I]* prevents the agency from treating as "discarded" the wastes at issue in this case, which are managed in land disposal units that *are* part of waste-

water treatment systems, which *have* therefore become "part of the waste disposal problem," and which are *not* part of the ongoing industrial processes.

907 F.2d at 1186 (emphasis in original).

Finally, in *United States v. ILCO, Inc.*, 996 F.2d 1126 (11th Cir.1993), ILCO, Inc. ("ILCO") purchased spent batteries from various sources and then recycled them. ILCO contended that, because it recycled the spent batteries, they had not been discarded and, therefore, were not solid waste. The Eleventh Circuit rejected this argument, stating:

> ILCO argues that it has never "discarded" the plates and groups [of the batteries] and, therefore, the material it recycles is not "solid waste" as defined in [section] 6903(27). The lead plates and groups are, no doubt, valuable feedstock for a smelting process. Nevertheless, EPA, with congressional authority, promulgated regulations that classify these materials as "discarded solid waste." *Somebody* has discarded the battery in which these components are found. This fact does not change just because a reclaimer has purchased or finds value in the components.

*Id.* at 1131 (emphasis in original).[4]

From these cases, we glean that the fundamental inquiry in determining whether a byproduct has been "discarded" is whether the byproduct is *immediately* recycled for use in the same industry; if not, then the byproduct is justifiably seen as "part of the waste disposal problem," *AMC I*, 824 F.2d at 1186, and therefore as a "solid waste." We think it reasonable and permissible, under *Chevron*, for the EPA to adhere to this inquiry in determining whether a material is "discarded."

Moreover, we find no abuse of discretion in EPA's conclusion that, under this interpretation, Owen's slag constitutes "discarded material" and therefore "solid waste." The slag is not immediately used in Owen's production process; rather, the slag must sit, untouched, for some six months before it is sold to other entities.[5] The EPA is justified in finding that, where a byproduct sits untouched for six months, it cannot be said that the material was *"never* 'disposed of, abandoned, or thrown away.'" *American Petroleum Inst.*, 906 F.2d at 741 (emphasis added) (quoting *AMC I*, 824 F.2d at 1193). The EPA is also justified to conclude that, because the slag is sold to others for use in roadbed construction, it is not "destined for beneficial reuse or recycling in a continuous process *by the generating industry itself,*" *AMC I*, 824 F.2d at 1186. In short, the EPA did not abuse its discretion in concluding that Owen's slag is "part of the waste disposal problem."

### IV

We conclude that Owen's slag is "solid waste" and that, therefore, the SPA was appropriately determined to be an SWMU. Owen's petition for relief is therefore denied.

*PETITION DENIED.*

---

**4.** Owen would distinguish *ILCO, Inc.* on the ground that, in *ILCO, Inc.*, the batteries contained constituent parts which clearly fell under the statutory definition of "hazardous." This fact, however, did not enter into the court's analysis. The crucial element of the Eleventh Circuit's reasoning is that the batteries became, in the words of *AMC I*, "part of the waste disposal problem," as soon as the various owners of the batteries discarded them. That ILCO, a third party, then agreed to recycle the batteries, thereby, at least in some sense, ameliorating the waste disposal problem, is irrelevant in the sense that that subsequent act does not divest the EPA of jurisdiction over the waste. In other words, once the batteries were discarded, they became classified as solid waste; subsequent treatment is irrelevant.

**5.** Even then, according to an EPA site inspection report, not all the slag is sold; some remains onsite indefinitely. *See* J.A. 176.