# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-08-00005-CV

Osage Environmental, Inc., Appellant

v.

Railroad Commission of Texas, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-GN-05-004551, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal concerns a suit for judicial review of a final order issued by appellee Railroad Commission of Texas finding that appellant Osage Environmental, Inc., violated its permit to handle oil and gas waste, Commission Statewide Rules 8 ("Rule 8") and 78 ("Rule 78"),[1] and statutes authorizing the Commission to regulate oil and gas waste. The district court affirmed the Commission's order, and Osage appeals. In five issues, Osage challenges the Commission's authority to require Osage to obtain a permit and the Commission's interpretation and application of its rules. Because we conclude that the Commission's final order was consistent with the statutes and rules authorizing the Commission to regulate oil and gas waste and that the Commission's final order was supported by substantial evidence, we affirm the district court's judgment affirming the Commission's final order.

---

[1]  16 Tex. Admin. Code §§ 3.8, .78 (2008) (Railroad Comm'n).

## BACKGROUND

As an oilfield waste hauler, John P. "Pat" Rozypal, president of Osage, contracted with oilfield operators to dispose of cuttings and other oilfield waste. In July 2000, an inspection by the Commission's district office revealed that Osage was receiving and storing oilfield waste consisting primarily of oil-based drill cuttings.[2] The testimony showed that Rozypal sometimes hauled the cuttings to an authorized disposal facility but, at other times, Rozypal would take the cuttings to the "Rozypal Ranch Facility" in Jim Wells County where Osage would stockpile it, hoping to recycle it into road base to sell to paving contractors.

When Rozypal first contacted the Commission in 1999 to ask if Osage needed to obtain a permit from the Railroad Commission, the Commission told him that Osage did not need a permit. In a letter dated September 3, 1999, the Commission explained that it was returning Rozypal's application because it understood that Osage had registered with the Texas Commission on Environmental Quality ("TCEQ"), formerly known as the Texas Natural Resources Conservation Commission ("TNRCC"), as a waste recycling facility under Title 30, Chapter 335 of the Texas Administrative Code. *See* 30 Tex. Admin. Code §§ 335.1-.594 (2008) (TCEQ). Upon further consideration, the Commission determined that, in fact, Rule 8 required Osage to obtain a permit to "store and process waste and re-use processed material as road base." *See* 16 Tex. Admin. Code § 3.8 (2008). The Commission notified Osage that a permit was required in a letter dated July 31, 2000, and requested Osage to file a completed permit application on or before August 31, 2000.

---

[2] Drill cuttings are bits of rock and soil cut from subsurface formations by the drill bit during the process of drilling a well and then lifted to the surface by circulation of oil-based drilling fluids.

2

On August 28, 2000, Rozypal sent a letter to the Commission's Environmental Services Division on behalf of Osage requesting "a letter of authority and or recycling permit for certain types of oilfield waste subject to the jurisdiction of the [Commission]." Although some negotiations occurred between Osage and the Commission, in a letter dated December 19, 2000, the Commission denied Osage's application based on numerous deficiencies. This letter also advised Osage of its right to request a hearing. Without requesting a hearing, Osage filed suit against the Commission in a Travis County district court. By its suit, Osage sought a declaration on whether the Commission properly applied Rule 8 to require Osage to obtain a permit. While this suit was pending, Osage continued to negotiate the terms of a permit with Commission staff. Osage also continued to receive oilfield waste at the Rozypal Ranch Facility.

In June 2003, Osage and the Commission reached an agreement on the permit terms. Osage also agreed to reduce its stockpile of waste to 10,000 cubic yards, to file required reports with the Commission, and to file financial security with the Commission as required by Rule 78. *See* 16 Tex. Admin. Code § 3.78 (2008); *see also* Tex. Nat. Res. Code Ann. § 91.109 (West Supp. 2007). Based on these agreements, the Commission issued permit number STF-011 to Osage on June 26, 2003, and Osage dismissed its lawsuit against the Commission.

Shortly thereafter, an inspection revealed that Osage had breached the agreement to reduce its stockpile of waste. The inspection found that instead of reducing its stockpile of waste, Osage had continued to receive even more waste. Moreover, Osage had not filed the required financial security with the Commission. *See* 16 Tex. Admin. Code § 3.78. In response to Commission demands, Osage submitted a timeline for compliance with the terms of its permit. But

Osage failed to meet its own timeline, and the Commission initiated administrative enforcement proceedings against Osage for violating the terms of its permit.

Osage again filed suit against the Commission and sought to enjoin the enforcement proceedings because Osage, as a *recycler*, was not subject to Commission regulation under Rule 8. After a temporary injunction hearing, the district court signed an agreed order that abated the enforcement proceedings until November 18, 2004, subject to Osage filing financial security with the Commission on or before August 6, 2004, and completing the necessary permit requirements to demonstrate the feasibility of recycling oilfield waste into quality road base material by November 3, 2004. The agreed order also provided that Osage could resume commercial operations in accordance with the terms of its permit once the Commission approved the financial security filed by Osage.

Osage filed the required security with the Commission in the form of a $500,000 bond on August 24, 2004. Although the Commission approved the bond filed by Osage, Osage did not fulfill the necessary permit requirements as specified in the agreed order. An inspection of the Rozypal Ranch Facility on January 14, 2005, showed that Osage had not reduced its stockpile of waste to the 10,000 cubic yards covered by its bond and that Osage was storing approximately 48,750 cubic yards of waste. A follow-up inspection two months later showed that the amount of stockpiled, unprocessed waste at the Rozypal Ranch Facility had grown to approximately 62,455 cubic yards.

Based on Osage's continued noncompliance, the Commission resumed its enforcement proceedings against Osage. The Commission held a hearing on Osage's alleged permit

4

and rule violations in May 2005, which resulted in a final order imposing administrative penalties of $40,000 against Osage for violations of its permit and Commission rules. The Commission denied Osage's motion for rehearing on November 29, 2005. Osage then filed a third lawsuit seeking judicial review of the Commission's final order. The district court affirmed the Commission's order in all respects, and this appeal followed.

## DISCUSSION

The primary issue before us is whether Osage, as a purported waste recycler, must comply with Rule 8. *See* 16 Tex. Admin. Code § 3.8. The record reveals a fundamental disagreement between Osage and the Commission about whether the ongoing recycling activities at the Rozypal Ranch Facility are subject to regulation by the Commission under Rule 8. In five issues, Osage challenges the Commission's regulatory authority under Rule 8 as well as its findings and conclusions that Osage was required to obtain a permit in the first instance and that Osage violated the permit issued by the Commission in 2003.

### *Standard of Review*

We review the Commission's final order under the substantial evidence rule. *See* Tex. Nat. Res. Code Ann. § 85.241 (West 2001); Tex. Gov't Code Ann. § 2001.174 (West 2000); *Railroad Comm'n v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 40 (Tex. 1991). Because our examination of the Commission's final order involves the interpretation of an administrative rule, "we employ well-settled principles of statutory construction." *Continental Cas. Co. v. Rivera*, 124 S.W.3d 705, 710 (Tex. App.—Austin 2003, pet. denied); *see Lewis v. Jacksonville Bldg. & Loan*

5

*Ass'n*, 540 S.W.2d 307, 310 (Tex. 1976). We review questions of statutory construction *de novo*. *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002); *Bragg v. Edwards Aquifer Auth.*, 71 S.W.3d 729, 734 (Tex. 2002). When ascertaining the scope of an agency's authority, we give great weight to the agency's construction of a statute it is charged with enforcing. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 196 (Tex. 1994). We also recognize that an administrative agency has the power to interpret its own rules, and its interpretation is entitled to great weight and deference. *Gulf States Utils. Co. v. Public Util. Comm'n*, 784 S.W.2d 519, 527 n.5 (Tex. App.—Austin 1990), *aff'd*, 809 S.W.2d 201, 207 (Tex. 1991) (citing *Udall v. Tallman*, 380 U.S. 1, 16 (1965)). An agency's construction of its rules is controlling unless it is plainly erroneous or inconsistent with the text of the rule. *Rivera*, 124 S.W.3d at 710; *Gulf States Utils. Co.*, 784 S.W.2d at 528. As a reviewing court, we may not view a part of the rule in isolation. *Rivera*, 124 S.W.3d at 710. We must consider the rule as a whole, and we must also ensure that the agency has interpreted its rule in harmony with its enabling statute. *Id.*

### Commission Enforcement Authority

In its first two issues, Osage challenges the district court's judgment affirming the Commission's conclusions that Osage violated Rule 8 and Rule 78. *See* 16 Tex. Admin. Code §§ 3.8, .78. Osage argues that the Commission erred in its conclusion that Osage violated these rules because the Commission had no authority to require Osage to obtain a permit in the first instance. The crux of Osage's argument is that it was *recycling*, not disposing of or reclaiming, the drill cuttings that it received. For the following reasons, we disagree.

6

The legislature has charged the Commission with authority to prevent pollution of surface water or subsurface water from activities associated with the exploration, development, and production of oil and gas or geothermal resources. *See* Tex. Nat. Res. Code Ann. § 91.101 (West Supp. 2007); Tex. Water Code Ann. § 26.131(a) (West 2008). Section 91.101 of the natural resources code authorizes the Commission to adopt and enforce rules and allows the Commission to issue permits relating to "the discharge, storage, handling, transportation, reclamation, or disposal" of oil and gas waste or any other substance or material associated with any operation or activity regulated by the Commission. Tex. Nat. Res. Code Ann. § 91.101. And section 91.1011 of the natural resources code defines oil and gas waste as "waste that arises out of or incidental to the drilling for or producing of oil or gas," including, among other things, "salt water, brine, sludge, drilling mud, and other liquid, semiliquid, or solid waste material." *Id.* § 91.1011 (West 2001). Section 26.131 of the water code also provides that:

> [t]he Railroad Commission of Texas is solely responsible for the control and disposition of waste and the abatement and prevention of pollution of surface and subsurface water resulting from . . . activities associated with the exploration, development, and production of oil or gas or geothermal resources.

Tex. Water Code Ann. § 26.131(a).

*Rule 8 — Water Protection*

To comply with its legislative mandate to prevent the pollution of surface and subsurface water, the Commission adopted Rule 8. *See* 16 Tex. Admin. Code § 3.8. Rule 8 is the most comprehensive Commission rule relating to water protection. *Id.* In relevant part, Rule 8

7

provides that "no person may dispose of any oil and gas wastes by any method without obtaining a permit to dispose of such wastes." *Id.* § 3.8(d)(1). Subsection (a)(26) defines the term "oil and gas wastes" to include:

> [m]aterials to be disposed of or reclaimed which have been generated in connection with activities associated with the exploration, development and production of oil and gas or geothermal resources, as those activities are defined in paragraph (30) of this subsection, and materials to be disposed of or reclaimed which have been generated in connection with activities associated with the solution mining of brine.

*Id.* § 3.8(a)(26). This definition further provides that the term "oil and gas wastes" includes, but is not limited to, "saltwater, other mineralized water, sludge, spent drilling fluids, *cuttings*, waste oil, spent completion fluids, and other liquid, semiliquid, or solid waste material." *Id.* (emphasis added). Rule 8 also defines what it means to dispose of oil and gas wastes:

> To dispose—To engage in any act of disposal subject to regulation by the commission including, but not limited to, conducting, draining, discharging, emitting, throwing, releasing, depositing, burying, landfarming, or allowing to seep, or to cause or allow any such act of disposal.

*Id.* § 3.8(a)(24).

*Rule 78 — Fees and Financial Security Requirements*

In addition to Rule 8, the Commission has adopted Rule 78 relating to fees and financial security requirements for commercial facilities. *See* 16 Tex. Admin. Code § 3.78. Essentially, Rule 78 requires a facility owner or operator to provide financial security for the estimated closure costs of the facility if the owner or operator "receives compensation from others

8

for the storage, reclamation, treatment, or disposal of oil field fluids or oil and gas wastes that are wholly or partially trucked or hauled to the facility and whose primary business is to provide these services for compensation" if, among other things, the facility is permitted under Rule 8. *See id.* § 3.78(a)(3) (defining "commercial facility"), (*l*)(1)(A)(I) (requiring estimate of maximum dollar amount to close facility), (*l*)(3)(A) (requiring financial security).

*The Evidence*

During the administrative hearing, Rozypal testified that Osage was in the business of recycling "oil based cuttings" into road base, and he described Osage's recycling process as follows:

> [W]e take a material or an ingredient that we take off the drilling rigs and we bring it into our facility. The ingredient is immediately mixed with caliche, which has calcium and lime, and then we start what is called a pre-process. Then if we wanted to further enhance the material to make it where it was, say, had better compressive strengths, depending on the type of road or parking lot that it was going to go on, then we would enhance it by maybe adding some other chemicals such as an asphalt emulsion or some cement or lime to improve the compressive strengths and the stability of the material and kind of depending on the order. Then we would . . . sell it to different customers.

Osage also provided testimony that, when properly completed, the recycling process used by Osage would encapsulate the oil based cuttings and allow Osage to sell the resulting product as road base. Thus, according to Osage, it was *recycling* oil based cuttings and was not engaged in the disposal or reclamation of oil and gas wastes as described in Rule 8 and, therefore, was not required to obtain a permit.

9

The evidence revealed, however, that when Osage transported the oil based cuttings to the Rozypal Ranch Facility it would discharge the cuttings from a truck and deposit them directly on the ground, where they would be subject to the elements and potential surface water run-off. Osage would then mix the oil based cuttings with caliche and re-deposit and store this "premix material" on the ground. An April 8, 2003, inspection report prepared by the Commission's district office showed that Osage had a stockpile of approximately 24,000 cubic yards of waste mixed with caliche. Subsequent inspection reports dated November 25, 2003, and April 21, 2004, showed that Osage's premix stockpile of waste and caliche had grown to approximately 27,000 cubic yards. And another inspection report dated March 16, 2005, showed that Osage had accumulated approximately 62,455 cubic yards of oil based cuttings mixed with caliche in a pile 292′ x 385′ x 15′ high.

The plain language of Rule 8 defines "oil and gas waste" to include drill cuttings. *See* 16 Tex. Admin. Code § 3.8(a)(26); *see also* Railroad Comm'n of Tex., *Waste Minimization in the Oil Field* 4-1 (July 2001), *available at* http://www.rrc.state.tx.us/divisions/og/key-programs/manual/wastemin.pdf.[3] This definition is consistent with the Commission's enabling act, which defines "oil and gas waste" as "waste arising out of or incidental to the drilling for or producing of oil or gas," including solid waste material. *See* Tex. Nat. Res. Code Ann. § 91.1011.

Despite the plain language of these definitions, Osage argues that, because it *intended* to recycle the cuttings into road base, the oil based cuttings it receives at the Rozypal Ranch Facility

---

[3] Commission Statewide Rule 30 also identifies cuttings as "waste materials . . . subject to the jurisdiction of the [Railroad Commission]." *See* 16 Tex. Admin. Code § 3.30(e)(1) (2008) (Memorandum of Understanding Between the Railroad Commission of Texas and the Texas Commission on Environmental Quality).

are not "oil and gas waste" within the meaning of the statute or the Commission's rule. Osage further argues that its intent is controlling with regard to whether the cuttings are an "oil and gas waste" or merely an ingredient used in its recycling process. Although the parties agreed that Osage was operating a legitimate recycling facility, the Commission rejected Osage's argument and concluded that the cuttings received by Osage did not lose their identity as "oil and gas waste" until they have been recycled into finished road base within the parameters of the permit issued to Osage.[4] As a result, the Commission concluded that Osage was required to obtain a permit and that Osage violated Rule 8(d)(1) by depositing or discharging oil and gas waste without a permit.

The Commission's conclusions are supported by the plain language of the statutes it is charged with enforcing and its rules. *See* Tex. Nat. Res. Code Ann. §§ 91.101, .1011; Tex. Water Code Ann. § 26.131; 16 Tex. Admin. Code § 3.8. The legislature has given the Commission broad powers to prevent water pollution, including the power to issue permits relating to the discharge, storage, handling, transportation, reclamation, or disposal of oil and gas waste or of any other substance or material associated with any operation or activity regulated by the Commission. *See* Tex. Nat. Res. Code Ann. §§ 91.101, .1011; Tex. Water Code Ann. § 26.131; *Lone Star Salt Water*

---

[4] Federal courts that have considered arguments similar to Osage's have likewise rejected such arguments. *See Owen Elec. Steel Co. v. Browner*, 37 F.3d 146, 149-50 (4th Cir. 1994) (discussing cases and concluding that slag, which lay on the ground for six months for tempering and weathering, was not used immediately in the steel production process and was, therefore, subject to EPA permitting requirements under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C.A. §§ 6901-6992k (West 2003 & Supp. 2008)); *American Mining Congress v. EPA*, 824 F.2d 1177, 1185-86 (D.C. Cir. 1987) (explaining that materials used in *ongoing manufacturing or industry process* are not waste). Applying the rationale of these decisions to the circumstances presented here, the Commission properly determined that the cuttings received by Osage and stockpiled as "premix material" are waste because they lay on the ground and were not immediately used in an ongoing manufacturing or oil and gas industry process.

11

*Disposal Co. v. Railroad Comm'n*, 800 S.W.2d 924, 927 (Tex. App.—Austin 1990, no writ). Based on the record before us, we hold that the Commission acted within its authority to require Osage to obtain a permit for its activities. *See* Tex. Nat. Res. Code Ann. §§ 91.101, .1011; Tex. Water Code Ann. § 26.131; 16 Tex. Admin. Code § 3.8.

Moreover, we find no merit in Osage's argument that as a legitimate recycling facility it was not subject to Commission rules regulating the *disposal* of oil and gas waste. The Commission's enabling act gives the Commission broad discretion to regulate "the discharge, storage, handling, transportation, reclamation, or disposal of oil and gas waste" to prevent water pollution. *See* Tex. Nat. Res. Code Ann. § 91.101(4). As a reviewing court, we are not bound by the reasons given by the Commission in its final order, so long as there is a valid basis in the record to support the Commission's action. *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452-53 (Tex. 1984); *Railroad Comm'n v. City of Austin*, 524 S.W.2d 262, 279 (Tex. 1975). We may sustain the Commission's action if the evidence is such that reasonable minds could have reached the conclusion that the Commission must have reached in order to justify its action. *See Suburban Util. Corp. v. Public Util. Comm'n*, 652 S.W.2d 358, 364 (Tex. 1983). Even if we agreed with Osage's argument that it was not engaged in the *disposal* of oil and gas waste, the record evidence demonstrates that Osage's activities included, among other activities subject to Commission regulation, the transportation, storage, handling, and discharge of oil and gas waste. *See* Tex. Nat. Res. Code Ann. § 91.101; 16 Tex. Admin. Code § 3.8. We conclude that this evidence is such that reasonable minds could have reached the conclusion that the Commission must have

12

reached in order to justify its determination that Osage was required to obtain a permit. *See Charter Med.*, 665 S.W.2d at 452-53; *Suburban Util. Corp.*, 652 S.W.2d at 364.

With regard to Osage's claim that it was not required to file financial security because it was not required to obtain a permit, we likewise reject that claim. Having concluded that the Commission properly required Osage to obtain a permit for its activities, we conclude that the Commission acted within its authority to require Osage to file financial security. *See* Tex. Nat. Res. Code Ann. §§ 91.101, .109; Tex. Water Code Ann. § 26.131; 16 Tex. Admin. Code § 3.78. We overrule Osage's first and second issues.

### *Permit Violations*

In its third, fourth, and fifth issues, Osage contends that the Commission erred in concluding that Osage violated the terms of the permit issued by the Commission on June 26, 2003. Although Osage preserved these issues for our review by including them in its motion for rehearing before the Commission, *see Hill v. Board of Trs. of the Ret. Sys. of Tex.*, 40 S.W.3d 676, 679 (Tex. App.—Austin 2001, no pet.); *United Sav. Ass'n v. Vandygriff*, 594 S.W.2d 163, 169-70 (Tex. App.—Austin 1980, writ ref'd n.r.e.), we observe as an initial matter that Osage has failed to properly brief these issues on appeal. *See* Tex. R. App. P. 38.1(h). Texas Rule of Appellate Procedure 38.1 provides that a brief to this Court "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." *See id.*; *McIntyre v. Wilson*, 50 S.W.3d 674, 682 (Tex. App.—Dallas 2001, pet. denied). Osage's brief cites no authority for its claims that the Commission erred in concluding that Osage violated the terms of its permit. An issue on appeal unsupported by argument or citation to any legal authority presents

13

nothing for the appellate court to review. *See Strange v. Continental Cas. Co.*, 126 S.W.3d 676, 678 (Tex. App.—Dallas 2004, pet. denied). Accordingly, we conclude that Osage has presented nothing for our review. *See id.*

But even if we were to consider Osage's claims, on this record, we cannot conclude that the Commission erred in finding that Osage violated the terms of its permit. The record shows that the Commission issued permit number STF-011 to Osage on June 26, 2003. Under the terms of this permit, Osage was required to: (1) file semi-annual reports with the Commission; (2) file financial security with the Commission before receiving oil and gas waste at the Rozypal Ranch Facility; and (3) refrain from continuing to receive oil and gas waste at the Rozypal Ranch Facility when the financial security filed by Osage was not the amount of financial security required by Rule 78. As we construe Osage's arguments, Osage contends that it was not required to obtain a permit and, therefore, cannot be liable for violating the terms of a permit it was not required to obtain. Having previously determined that the Commission acted within its authority to require Osage to obtain a permit, we conclude there is no merit to Osage's claims.

The record showed that Osage was required to file semiannual reports beginning six months from the date of the permit. There is no evidence that Osage filed any reports with the Commission in compliance with the terms of its permit. The record also showed that Osage's permit included a provision requiring it to file financial security with the Commission prior to receiving oil and gas waste. Under the terms of its permit, Osage was required to file financial security in the amount of $508,402.90 based on a closure cost estimate for 10,000 cubic yards of waste. Inspection reports prepared by the Commission's district office showed that, as of November 25, 2003, Osage

14

had accumulated a stockpile of 27,000 cubic yards of waste mixed with caliche—well in excess of the 10,000 cubic yards of waste allowed under the terms of its permit. The record further demonstrated that Osage did not file financial security with the Commission until August 24, 2004. But even after filing its financial security, Osage continued to receive oil and gas waste in excess of the 10,000 cubic yards specified in its permit. An inspection report dated January 14, 2005, showed that Osage had stockpiled 48,750 cubic yards of oil and gas waste mixed with caliche. Another inspection report dated March 16, 2005, disclosed a stockpile of waste mixed with caliche of 62,455 cubic yards, in a pile 292′ x 385′ x 15′ high. We conclude that there is substantial evidence in the record to support the Commission's conclusions that Osage violated the terms of its permit. We overrule Osage's third, fourth, and fifth issues.

## CONCLUSION

Because we conclude that the Commission's final order was consistent with the statutes and rules authorizing the Commission to regulate oil and gas waste and that the Commission's final order was supported by substantial evidence, we affirm the district court's judgment affirming the Commission's final order.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed: July 24, 2008

15