## AMERICAN PETROLEUM INSTITUTE, et al., Petitioners,

v.

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

### Chemical Manufacturers Association, Intervenor.

Nos. 94–1683, 94–1684, 94–1686, 98–1494, 98–1506, 98–1507, 98–1514.

United States Court of Appeals, District of Columbia Circuit.

Argued March 30, 2000.

Decided June 27, 2000.

As Amended Aug. 18, 2000.

Michael W. Steinberg and Thomas Sayre Llewellyn argued the causes for petitioners American Petroleum Institute, et al. With them on the briefs were G. William Frick, Ralph J. Colleli, Jr., Joshua D. Sarnoff, David F. Zoll, Ronald A. Shipley, Christopher H. Marraro and John W. Kampman. Hunter L. Prillaman, David B. Graham and Judith A. Wenker entered appearances.

David Frederick and David R. Case argued the causes and filed the briefs for petitioners Louisiana Environmental Action Network, et al. Richard W. Lowerre entered an appearance.

Steven E. Silverman, Attorney, Environmental Protection Agency, Patricia R. McCubbin, Attorney, and Martin F. McDermott, Attorneys, U.S. Department of Justice, argued the causes for respondent. With them on the brief were Lois J. Schiffer, Assistant Attorney General, David J. Kaplan and Alan Birnbaum, Attorneys, and Alan H. Carpien, Attorney, Environmental Protection Agency. Christopher S. Vaden, Attorney, U.S. Department of Justice, entered an appearance.

Ralph J. Colleli, Jr. argued the cause for Intervenor American Petroleum Institute. With him on the brief were G. William Frick and Thomas S. Llewellyn. David F. Zoll and Ronald A. Shipley entered appearances.

Before: WILLIAMS, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed PER CURIAM.*

* Judge Sentelle authored Part I of this opinion, Judge Williams Part II, and Judge Rogers

PER CURIAM:

Two sets of petitioners challenge regulations of the United States Environmental Protection Agency ("EPA") promulgated under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* (1994). The EPA rulemaking at issue concerned regulating several secondary materials generated by the petroleum refining and petrochemical industries as "solid waste" and "hazardous waste."

Industry petitioners, American Petroleum Institute ("API"), the Chemical Manufacturers Association ("CMA"), and Texaco, Inc. (collectively, "industry petitioners"), assert two main categories of challenges. The first category challenges EPA's regulation under RCRA of two materials as solid waste. The second challenges EPA's listing of certain refinery wastes as hazardous waste. Environmental petitioners, Louisiana Environmental Action Network ("LEAN"), Communities for a Better Environment of California ("CBE"), the Sierra Club, and the Environmental Technology Council ("ETC") (collectively, "environmental petitioners"), challenge EPA's failure to list certain items and further allege an Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* (1994), notice and comment claim.

We deny the petition of the industry petitioners on all counts but one, on which we vacate and remand to EPA for further proceedings. Finding that we lack jurisdiction to consider the claims of environmental petitioners, we dismiss their petition.

## I. Industry Petitioners' Challenges to EPA's Regulation of Recovered Oil and Wastewaters as Solid Waste

### A. Statutory Framework

RCRA is a comprehensive environmental statute granting EPA authority to regulate solid and hazardous wastes. "Solid wastes" are governed by Subtitle D of

Part III.

RCRA, and are generally subject to less stringent management standards than "hazardous wastes" which are regulated under Subtitle C. For purposes of RCRA, Congress defined solid waste as follows:

> The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities . . . .

42 U.S.C. § 6903(27).

In pursuit of its congressionally conferred duty and authority to regulate solid waste under RCRA, the EPA has adopted regulations defining solid waste for purposes of its hazardous waste regulations: "A solid waste is any discarded material," 40 C.F.R. § 261.2(a)(1) (1999), subject to a number of exclusions enumerated in § 261.4(a) and case-by-case variances under §§ 260.30 and 260.31. The term "discarded material" for purposes of the regulation means any material which is abandoned, recycled, or considered inherently wastelike. 40 C.F.R. § 261.2(a)(2).

In 1994 and 1998 rulemakings in pursuit of its RCRA obligations, the EPA examined the production processes of the petroleum refining industry. As pertinent to the issue before us, EPA considered whether to exclude from the definition of solid waste two secondary materials: oil-bearing wastewaters generated by the petroleum refining industry and recovered oil produced by the petrochemical manufacturing industry. *See Hazardous Waste Management System, Identification and Listing of Hazardous Waste; Petroleum Refining Process Wastes; Land Disposal Restrictions for Newly Identified Wastes; and CERCLA Hazardous Substance Designation and Reportable Quantities,* 63

Fed.Reg. 42,110 (1998) ("Final Rule"); *Hazardous Waste Management System, Identification and Listing of Hazardous Waste; Petroleum Refining Process Wastes; Land Disposal Restrictions for Newly Identified Wastes; and CERCLA Hazardous Substance Designation and Reportable Quantities,* 60 Fed.Reg. 57,747 (1995) ("Proposed Rule"); *Identification and Listing of Hazardous Waste; Amendments to Definition of Solid Waste,* 59 Fed.Reg. 38,536 (1994) ("1994 Rule"). EPA determined that oil-bearing wastewaters are solid waste for purposes of RCRA regulation, and that recovered oil from petrochemical facilities is excluded from the definition of solid waste only when specified conditions are met. *See* Proposed Rule, 60 Fed.Reg. at 57,755/3–57,-756/1; Final Rule, 63 Fed.Reg. at 42,128–30; 40 C.F.R. § 261.4(a)(12), (18). Industry petitioners challenge these conclusions.

### B. Oil–Bearing Wastewaters

■ In petroleum refining, impurities are removed and usable hydrocarbon fractions are isolated from crude oil feedstock. *See* Final Rule, 63 Fed.Reg. at 42,113/3–42,115/1, 42,121/2. Large quantities of water are used, and the resulting wastewaters contain a small percentage of residual oil. These "oilbearing wastewaters" are destined for ultimate discharge, but only after a three-step treatment process is first applied. The first phase of treatment, known as "primary treatment," removes certain materials including the oil. This phase has at least two beneficial consequences: (1) it meets a Clean Water Act requirement that refineries remove oil from their wastewater, and (2) it allows refineries to recover a not insignificant quantity of oil (which industry claims can range up to 1,000 barrels a day at certain refineries) which is cycled back into the refinery production process.

Industry petitioners and EPA disagree over when these wastewaters become discarded for purposes of the solid waste definition. While no one disputes that discard has certainly occurred by the time the

wastewaters move into the later phases of treatment, the question is whether discard happens before primary treatment, allowing regulation of wastewater as solid waste at that point, or not until primary treatment is complete and oil has been recovered for further processing.

EPA's initial proposal excluded oil-bearing wastewaters. *See* 1994 Rule, 59 Fed. Reg. at 38,540/3 (citing *Identification and Listing of Hazardous Waste; Amendments to Definition of Solid Waste,* 53 Fed.Reg. 519, 525–26 (1988)). However, it changed its mind in 1994 and concluded that even before the oil is recovered in primary treatment, "the wastewaters are discarded materials and hence solid wastes subject to regulation under RCRA." 59 Fed.Reg. 38,540/1. EPA stated: "Primary wastewater treatment operations exist to treat plant wastewaters." *Id.* at 38,539/3. It noted that the percentage of oil in the wastewater is very small and "not significant in the context of a refinery's overall production activities," and that the Clean Water Act mandates such treatment. *Id.*; *see also* 40 C.F.R. Part 419; *API v. EPA,* 540 F.2d 1023 (10th Cir.1976) (discussing water discharge regulations). For these stated reasons, EPA concluded that "[c]learly, wastewater treatment is the main purpose of the systems in question, and any oil recovery is of secondary import." 59 Fed Reg. at 38,539/3.

EPA restated its conclusion in its subsequent 1995 Proposed Rule, 60 Fed.Reg. at 57,755/3, and retained it in the Final Rule. *See* 63 Fed.Reg. at 42,184 (codified at 40 C.F.R. § 261.4(a)(12)(ii)). The actual regulation does not mention wastewaters. But by not being excluded, all wastewaters including oil-bearing wastewaters are considered to fall under EPA's general regulatory definition of solid waste.

Whether a material has been "discarded," subjecting it to RCRA regulation, is a question we have considered in four prior cases. First, in *American Mining Congress v. EPA,* 824 F.2d 1177 (D.C.Cir.1987) ("*AMC I*"), we held that the term "dis-

carded" conforms to its plain meaning. *Id.* at 1193. Thus, items that are "disposed of, abandoned, or thrown away" are discarded. *Id.* *AMC I* concluded that "in-process secondary materials," that is, materials "destined for immediate reuse in another phase of [an] industry's ongoing production process," are not discarded under RCRA. *Id.* at 1185, 1193. We recently reaffirmed that holding in *Association of Battery Recyclers, Inc. v. U.S. EPA,* 208 F.3d 1047 (D.C.Cir.2000), where we reiterated that EPA cannot regulate as solid waste secondary materials "destined for reuse as part of a continuous industrial process" that is therefore "not abandoned or thrown away." *Id.* at 1056.

At the other end of the spectrum we have held that a material that has been "indisputably 'discarded'" can, of course, be subjected to regulation as solid waste. *API v. EPA,* 906 F.2d 729, 741 (1990). Where a material was "delivered to [a metals reclamation] facility not as part of an *'ongoing* manufacturing or industrial process' within 'the generating industry,' but as part of a mandatory waste treatment plan prescribed by EPA," we concluded that a material was not precluded from being classified by EPA as a solid waste. *Id.; see also United States v. ILCO, Inc.,* 996 F.2d 1126, 1132 (11th Cir. 1993) ("Previously discarded solid waste, although it may at some point be recycled, nonetheless remains solid waste.").

A material somewhere between the extremes of ongoing production and indisputable discard was addressed in *American Mining Congress v. EPA,* 907 F.2d 1179 (D.C.Cir.1990) ("*AMC II*"). Industry petitioners claimed that sludges from wastewater stored in surface impoundments, which "may" later be reclaimed for treatment, could not be regulated. *Id.* at 1186. We disagreed and deferred to EPA's determination that such sludges have been discarded. Nothing, we reasoned, prevents EPA from regulating as "solid wastes" materials managed in land disposal units which are no longer part of an industrial process. *See id.* at 1186–87; *see also Owen Elec. Steel Co. of S.C., Inc. v. Browner,* 37 F.3d 146, 150 (4th Cir.1994) (slag recycled after sitting for up to six months was reasonably classified as solid waste).

Industry petitioners rely primarily on *AMC I.* They first contend that the oil-bearing wastewaters at issue in this case cannot be classified as discarded because *AMC I* already said they are not. We disagree. True, API's brief in *AMC I* characterized oil-bearing wastewaters as part of an ongoing industrial process. Our opinion in *AMC I,* however, did not decide this question. We only held that in-process secondary materials are not "discarded" so that EPA could not regulate them; we did not address the discard status of any of the particular materials discussed in the briefs. *See AMC I,* 824 F.2d at 1181 (describing the petroleum refining process); *cf. Battery Recyclers,* 208 F.3d at 1056 (holding that "all we can say with certainty is that at least some of the secondary material EPA seeks to regulate" is not discarded).

Industry petitioners also contend that even if *AMC I* did not decide the issue, oil-bearing wastewaters cannot be regulated because they are (as claimed in API's *AMC I* brief) unquestionably in-process materials not yet discarded. Alternately, even if the status of oil-bearing wastewaters is not so plain, petitioners assert that EPA's conclusion is arbitrary and capricious because it is not based on reasoned decisionmaking. *See, e.g., Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation marks omitted). Petitioners emphasize that primary treatment yields valuable oil that is reinserted into the refining processes in a continuous operation. They also claim that oil recovery operations began long

before Clean Water Act regulations required it. In sum, they contend that oil recovery in primary treatment is a part of in-process oil production.

■ At bottom, the parties disagree over the proper characterization of primary treatment. Is it simply a step in the act of discarding? Or is it the last step in a production process before discard? Our prior cases have not had to draw a line for deciding when discard has occurred. While the issue was closest in *AMC II*, the sludges in dispute there were described as being stored in surface impoundments "that may at some time in the future be reclaimed." *AMC II*, 907 F.2d at 1186. We concluded that EPA's interpretation of "discarded" as including the sludges was reasonable and entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See AMC II*, 907 F.2d at 1186–87; *Battery Recyclers*, 208 F.3d at 1055; *cf. Owen Elec.*, 37 F.3d at 150. We did not, however, focus on whether EPA's reasoning to reach that result was arbitrary or capricious under the APA. *See State Farm*, 463 U.S. at 43, 103 S.Ct. 2856; 5 U.S.C. § 706(2)(A) · (1994). The second step of *Chevron* analysis and *State Farm* arbitrary and capricious review overlap, but are not identical. *See Michigan v. EPA*, 213 F.3d 663, ——, 2000 WL 180650, *17 (D.C.Cir.2000); *Arent v. Shalala*, 70 F.3d 610, 614–16 (D.C.Cir.1995).

■ It may be permissible for EPA to determine that the predominant purpose of primary treatment is discard. Legal abandonment of property is premised on determining the intent to abandon, which requires an inquiry into facts and circumstances. *See Baglin v. Cusenier Co.*, 221 U.S. 580, 597–98, 31 S.Ct. 669, 55 L.Ed. 863 (1911); *International Finance Corp. v. Jawish*, 71 F.2d 985, 986 (D.C.Cir. 1934); *see also Katsaris v. United States*, 684 F.2d 758, 761–62 (11th Cir.1982) (collecting cases). Where an industrial by-product may be characterized as discarded or "in process" material, EPA's choice of characterization is entitled to deference. *See AMC II*, 907 F.2d at 1186. However, the record must reflect that EPA engaged in reasoned decisionmaking to decide which characterization is appropriate. The record in this case is deficient in that regard. EPA has noted two purposes of primary treatment and concludes, "[c]learly, wastewater treatment is the main purpose." 1994 Rule, 59 Fed.Reg. 38,539/3. As English teachers have long taught, a conclusion is not "clear" or "obvious" merely because one says so.

EPA points out that primary treatment only recovers a small amount of oil relative to the entire output of a typical refining facility. However, the oil is still valuable and usable, so that reason alone cannot show discard. The rock of a diamond mine may only contain a tiny portion of precious carbon, but that is enough to keep miners busy. According to claims by the refining industry, the net amount of oil recovered may reach 1,000 barrels a day for certain refineries. It is plausible to claim, as industry petitioners do, that refiners engage in primary treatment first and foremost to recover this usable resource. At the very least, EPA cannot merely rely on the small relative amount of oil recovered from primary treatment without further explanation.

EPA also notes that the Clean Water Act requires primary treatment before discharge. If refiners got nothing from primary treatment, this might be a compelling rationale because it would be hard to explain why, other than to discard, refiners would engage in a costly treatment activity with no economic benefits. *See API*, 906 F.2d at 741. However, petitioners claim they would engage in primary treatment regardless of the treatment standards in order to recover the desired oil. EPA does not explain why this possibly valid motivation is not compelling. EPA makes no attempt to balance the costs and benefits of primary treatment, or otherwise to explain why the Clean Water Act requirements are the real motivation behind pri-

mary treatment. Indeed, without further explanation, it is not inherently certain why a substance is definitively "discarded" if its possessor is continuing to process it, even though the possessor's decision to continue processing may have been influenced, or even predominantly motivated, by some external factor. Otherwise put, it is not so obvious as EPA would have us hold that if the industry petitioners conceded that their overriding motivation in further processing the wastewaters was compliance with Clean Water Act regulations that they would then conclusively be discarding the material in question even while further processing it. If the non-Clean Water Act benefits of the initial treatment are enough to justify firms' incurring the costs (petitioners point to material in the record that may support such a proposition), the EPA would have to reconcile that fact with any conclusion that the Clean Water Act purpose was primary.

In short, EPA has not set forth why it has concluded that the compliance motivation predominates over the reclamation motivation. Perhaps equally importantly it has not explained why that conclusion, even if validly reached, compels the further conclusion that the wastewater has been discarded. Therefore, because the agency has failed to provide a rational explanation for its decision, we hold the decision to be arbitrary and capricious. *See State Farm,* 463 U.S. at 46–57, 103 S.Ct. 2856; *Illinois Public Telecomms. Ass'n v. FCC,* 117 F.3d 555, 564 (D.C.Cir. 1997). We therefore vacate the portion of EPA's decision declining to exclude oil-bearing wastewaters from the statutory definition of solid waste, and remand for further proceedings. We do not suggest any particular result on remand, only a reasoned one demonstrating when discard occurs if EPA wishes to assert jurisdiction.

### C. Petrochemical Recovered Oil

■ Unlike petroleum refiners, petrochemical manufacturers do not refine crude oil but instead use refined petroleum products and other feedstocks to produce petrochemical products such as organic chemicals. These production processes can produce residual oil, known as "petrochemical recovered oil." Final Rule, 63 Fed.Reg. at 42,114 n.2. This oil can be inserted into the petroleum refining process.

EPA crafted a regulation excluding petrochemical recovered oil from the definition of solid waste, provided that certain conditions are met. These conditions are designed to disqualify from the exclusion oil that contains non-refinable hazardous materials. *See id.* at 42,129–30. EPA was concerned that if additional unneeded materials present in petrochemical recovered oil were covered by the exclusion, it would allow for the improper disposal of waste materials through adulteration. Such activity is called "sham recycling." *See United States v. Marine Shale Processors,* 81 F.3d 1361, 1365 (5th Cir.1996). Simply put, if extra materials are added to petrochemical recovered oil that provide no benefit to the industrial process, EPA finds this to be an act of discard under the guise of recycling. Although EPA apparently does not know if sham recycling actually occurs in this industry, it was concerned because some of the petrochemical recovered oil samples it tested were contaminated with chlorinated or other halogenated materials that were unexpected.

The EPA rule promulgated excludes from its solid waste definition "petrochemical recovered oil ... to be inserted into the petroleum refining process .... along with normal petroleum refinery process streams, provided [that] [t]he oil is hazardous only because it exhibits the characteristic of ignitability ... and/or toxicity for benzene...." Final Rule, 63 Fed.Reg. 42,185 (codified at 40 C.F.R. § 261.4(a)(18)(i)). EPA explained that the ignitability and benzene toxicity properties are typical of or very similar to basic petroleum refining feedstocks. *See* Final Rule, 63 Fed.Reg. at 42,130/1. Thus, the exclusion does not cover petrochemical re-

covered oil that is hazardous due to the presence of other hazardous materials. The exclusion also contains other conditions meant to help curb sham recycling, such as when petrochemical recovered oil is "speculatively accumulated before being recycled into the petroleum refining process." *Id.*

Industry petitioner CMA makes one argument, premised solely on *Chevron* step one. CMA argues that EPA has no authority to regulate any petrochemical recovered oil under any circumstances because such materials are not "discarded." The reasonableness of the conditions adopted by EPA as part of its exclusions are not challenged because, in CMA's opinion, no such conditions may be imposed.

This *Chevron* plain meaning argument fails because EPA is correct that abandoning a material is discarding even if labeled recycling. EPA is not violating *AMC I*'s definition of discard. To the contrary, the premise of EPA's rule is sound precisely because it is meant to regulate only discarded materials. EPA can regulate material "discarded" through sham recycling even though it cannot regulate under RCRA materials that are not discarded. Speculatively accumulated recovered oil is a clear example of a condition imposed under the exclusion which shows that some petrochemical recovered oil can indeed be considered as discarded. Even if, assuming for the sake of argument, the rule's many conditions might incidentally regulate oil containing chemicals not caused by sham recycling (and therefore not discarded), that is beyond the claim we consider today. Presumably a refiner in a specific case could attempt to show that additional chemicals in the oil are not a product of adulteration, not discarded, and outside EPA's authority to regulate such material under RCRA. We therefore deny CMA's petition as to petrochemical recovered oil.

## II. Industry Petitioners' Challenges to Listing of Refinery Wastes as Hazardous

 Industry petitioners allege that the listed refinery residuals do not pose a "*substantial* present or potential hazard to human health or the environment," RCRA § 1004(5)(B), 42 U.S.C. § 6903(5)(B); 40 C.F.R. § 261.11(a)(3) (emphasis added), and thus were improperly listed as "hazardous waste." Their argument is based on EPA's explicit recognition that for some of the wastestreams at issue "population risk" is "near zero." Notice of Proposed Rulemaking: Hazardous Waste Management System, 60 Fed.Reg. 57,747, 57,789/2 (1995). Our disposition of this claim turns on the relationship between "individual risk," which EPA regarded as substantial, and "population risk," which for some wastestreams it acknowledged as negligible. Until a letter filed after oral argument, petitioners did *not* attack the EPA's characterization of the individual risks, and thus we have no occasion to consider whether the agency lawfully characterized such risks as substantial.

Before considering this claim, we pause for a brief explication of these concepts. "Population risk" is, as its name suggests, the risk of the population at large, generally calculated as an "upper bound" estimate of risk for the population overall. It is commonly measured in terms of health effects cases over a given time period (e.g., cancer deaths caused per year). Draft Report: Assessments of Risks From the Management of Petroleum Refining Wastes: Background Document 2–25 (October 1995) ("Draft Report"). "Individual risk" is calculated variously as a "bounding estimate," a "central tendency estimate," or a "high-end estimate," for a member of a particular segment of the population. *Id.* at 2–33. (For high-end estimates, the agency set the two most sensitive parameters at the high end (90th percentile point on the distribution), and set the others at their central tendency. Final Rule, 63 Fed.Reg. at 42,117/2, 42,120 (Table IV–2) (1998).) Unlike population risk, individual risk is commonly measured in terms of *lifetime* risk. As the term population risk

seems to imply, it is an aggregate, calculated either by "summing the estimated individual risk over all of the individuals in the population," Draft Report at 2–34, or by estimating methods aimed at the same goal, *id.* EPA counsel confirmed at oral argument that population risk aggregates individual risk.

Suppose, for example, that a particular waste poses an individual 1–in–100,000 lifetime risk of death from cancer to 100 people. The estimated annual population risk is 1 in 100,000 divided by 70, since the "individual" risk estimate assumes a 70–year lifespan, and multiplied by 100, to reflect the 100 persons exposed; thus the estimated additional annual cancer incidence for this population is 100 X 1/7,000,-000 = 1.4 X $10^{-5}$ (or, 1.4 cases every 100,000 years). Of course any other cancer cases estimated to result from exposure to the waste across the overall population would be added in to produce the complete population risk estimate.

According to established EPA practice, wastestreams with "high-end individual cancer-risk level[s]" of 1 in 100,000 lifetimes or higher "generally are considered initial candidates" for listing, and those that pose a risk of at least 1 in 10,000 lifetimes are "presumptively assumed" to merit listing. Notice of Proposed Rulemaking: Hazardous Waste Management System, 59 Fed.Reg. 66,072, 66,077 (1994). EPA found that the risks posed by the refinery residuals generally met at least the candidate level for listing. *See* Final Rule, 63 Fed.Reg. at 42,150–55. But in the case of one subcategory of clarified slurry oil ("CSO") sediment, namely landfilled sediments, EPA appears to acknowledge that high-end individual risk was actually as low as 4 X $10^{-6}$, i.e., 4 cancer deaths in one million lifetimes of exposure,

*id.* at 42,152/2 (expressed as "4E–6"), and "that the incremental [population] risk in terms of cancer cases avoided would be near zero." Notice of Proposed Rulemaking: Hazardous Waste Management System, 60 Fed.Reg. 57,747, 57,789 (1995). Petitioners argue that EPA's failure to consider the "near zero" population risk, which by their calculations based on EPA's figures ranged from 0.3 cancer cases in 10,000 years to 0.7 cases in 1 million years, API's Initial Br. at 34, rendered its listing unlawful. 5 U.S.C. § 706(2)(A).[1]

Were population risk a factor that EPA had to weigh with and against individual risk to determine whether a particular hazard was "substantial," the Agency would have to provide a reason for ignoring it in this instance. *Dithiocarbamate Task Force v. EPA*, 98 F.3d 1394, 1398–99 (D.C.Cir.1996). But neither the statute nor the regulation identifies population risk per se as one of the mandatory factors that the Agency must consider. *See* 42 U.S.C. § 6921(a); 40 C.F.R. § 261.11(a)(3). Under EPA's regulations, the Administrator must "consider[ ]" "[t]he nature and severity of the human health and environmental damage that has occurred" from mismanagement of the waste, 40 C.F.R. § 261.11(a)(3)(ix); but this does not necessarily imply that substantial individual risk alone, without high population risk, cannot be enough to constitute a "substantial ... hazard."

Much of what EPA has written could be taken as requiring substantial population risk. Thus, here it observed, "Population risk is only one of many factors to be considered," Final Rule, 63 Fed.Reg. at 42,138/3, arguably suggesting that it always "consider[s]" it, so that zero or near-zero population risk would exonerate, or tend to exonerate, a wastestream. In con-

---

**1.** The passages of the record cited by petitioners for a population risk as low as 0.7 cases in a million years appear to refer not to an overall aggregate but only to the risk for a *subset* of the exposed population, 76 home gardeners. *See* Joint Appendix at 2592. EPA, however, does not defend on the basis

that petitioners have chosen an incomplete figure for population risk. (We note that a population risk of 0.7 cases in a million years is equivalent to an individual risk of 5 cancers in 100,000 lifetimes, which would be within EPA's "candidate" levels for listing.)

text, however, we believe we may discern the Agency's path to its conclusion that individual risk alone may be enough to justify a hazardous waste listing, regardless of population risk. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). EPA states, for instance, that it "does not believe that it is appropriate to allow contamination from waste management units to cause substantial risk · *to nearby residents* simply because there are few wells in the immediate area" and that its "decision to list these wastes is based primarily on the concern over risks to those individuals who are significantly* exposed, even if there are relatively few of them." Final Rule, 63 Fed.Reg. at 42,-138/3 (emphasis added). These justifications are consistent with its 1995 Guidance for Risk Characterization, which states that when small populations are exposed (and thus population risk is low), "individual risk estimates will usually be a more meaningful parameter for decision-makers." *Id.* Moreover, EPA cited instances (primarily in the Superfund context) in which, consistent with this reasoning, it "rejected using population risk as the point of departure" and took action because of the high individual risk even though population risk was low. *Id.* at 42,139/1. We thus read EPA as saying—in consonance with both the governing statute and regulation—that it will regulate a waste that poses a substantial risk to highly exposed individuals, even if that risk poses a relatively small risk to the population at large.

Petitioners also argue that if RCRA is read to allow EPA to list wastes that pose "near zero" population risk without establishing a stopping point, then the statute effectuates a violation of the nondelegation principle. *See American Trucking Ass'ns, Inc. v. EPA*, 175 F.3d 1027, 1034 (D.C.Cir. 1999) (per curiam), *modified on reh'g*, 195 F.3d 4 (D.C.Cir.1999), *cert. granted*, —— U.S. ——, 120 S.Ct. 2003, 146 L.Ed.2d 954 (2000). But petitioners failed to attack EPA's judgment that the individual risks

presented here alone constituted a "substantial" hazard; rather they assumed the necessity of a population risk factor, and then attacked any notion of population risk that could slide so low. But in the EPA view population risk drops out of the calculation altogether under the facts presented, so we have no occasion to review petitioners' claim that the "population risk" factor is unduly elastic.

Industry petitioners also allege that even if the listings are valid, they nonetheless are overbroad and should be vacated. Several of these contentions, we think, are not only adequately answered in the EPA's brief but are also too fact-specific to justify exposition in a published opinion. The other two call for explicit analysis.

■ First, petitioners argue that EPA's listing of CSO sediment is overbroad. Although according to petitioners "CSO is often blended, in various proportions, with other petroleum products," EPA sampled only sediment from CSO stored by itself. API's Initial Br. at 46. In defense of its action EPA appeals to the well-established "mixture rule," providing that the mixture of a solid waste and a listed hazardous waste is itself a hazardous waste. 40 C.F.R. § 261.3(a)(2)(iv).

Although EPA's brief reads as if it viewed the decision here as a simple application of the mixture rule, industry petitioners point out that, strictly speaking, this is not so: sediment generated from a mixture of CSO and other refinery products is not itself the mixture of CSO sediment with a solid waste. To put it more generally, to say that any mixture of hazardous waste $X$ and solid waste $Y$ (the latter being *any* solid waste whatever) is a hazardous waste—as the mixture rule does—is not exactly the same as saying that where the sediment of $X$ is a hazardous waste, the sediment of $X$ and $Y$ ($Y$ being any substance whatever) is a hazardous waste. Thus,· we think EPA in fact extended its mixture rule, or developed a corollary. But petitioners have pointed us

to nothing in the record or in common sense that would contradict EPA's belief that the sediment generated from a CSO blend would contain CSO sediment. *See* Final Rule, 63 Fed.Reg. at 42,153/2 (asserting that it would be likely to generate CSO sediment). On this record, then, we see nothing to upset the EPA decision.

Second, industry petitioners argue that EPA's listing of guard beds was arbitrary and capricious. These are related to hydrotreating and hydrorefining catalysts, which EPA decided to list, and to hydrocracking catalysts, which it did not list. EPA acknowledged that there is no "universally established or accepted" way of distinguishing among these three processes, although they can be viewed as differing in terms of "degrees of severity of operating conditions and conversion of larger hydrocarbons to smaller molecules ('cracking'), and/or feeds." Final Rule, 63 Fed.Reg. at 42,-155/1. The proposed regulations defined hydrorefining as including "processes where 10 percent of the feed or less is reduced in molecular size," and hydrocracking as including "processes where 50 percent of the feed or more is reduced in molecular size." *Id.* at 42,155/2. EPA rejected this proposal, determining that the "simplest way" to distinguish hydrocracking catalysts from hydrotreating and hydrorefining catalysts was to rely on the categories used by the DOE's Petroleum Supply Annual, under which refineries annually submit data on operating capacity for catalytic hydrocracking and catalytic hydrotreating. *Id.* at 42,-155/2–3. "[I]f a refinery has been classifying its hydroprocessor as a catalytic hydrocracker for the purposes of the DOE's Form EIA–820, spent catalyst from this unit would not be covered by K171 or K172," and conversely for hydrotreaters. *Id.* at 42,155/3.

EPA, however, excepted "guard beds" from this criterion, ruling that their wastes should be listed regardless of the refinery's classification. Guard beds "are used

to extend the life of the downstream catalytic bed (e.g., reformer, hydrocracker, isomerization reactor) by removing sulfur, oxygen, nitrogen, and/or heavy metals." *Id.* at 42,156/1. EPA provided little by way of explanation for its classification, except to say that it "agrees [with the catalyst reclaimers] that these pretreatment units, or 'guard units,' should be covered under the listing descriptions in today's rule." *Id.*

EPA's description of guard beds as "desulfurization pretreaters," *id.*, however, shows that it viewed them as fitting squarely within the DOE definition of catalytic hydrotreating, which includes "desulfurization [and] removal of substances (e.g., nitrogen compounds) that deactivate catalysts." *Id.* at 42,155/3. Thus, if EPA was correct in using the DOE classifications *generally*, a proposition petitioners do not contest, and if the reason for using those classifications here pointed toward listing guard beds, it was reasonable for EPA to do so—even though, for reasons that are unclear, guard beds end up otherwise classified for DOE.

This is true even if, as industry petitioners commented below and now argue, guard beds may involve some hydrocracking in reducing the feedstock molecular size. EPA rejected a reliance on molecular conversion rates in favor (implicitly) of the processes' roles in removing contaminants; accordingly it could permissibly classify guard beds with the other listed processes.

III. Environmental Petitioners' Challenges to EPA's Non–Listing Determinations, and Notice and Comment Claim

Environmental petitioners, *see supra* at 3, challenge EPA's decisions not to: (1) classify unleaded gas storage tank sediment ("UGSTS") as a hazardous waste; (2) exempt otherwise "hazardous" wastes from being classified as such if they are used in the petroleum coking process, on the basis of inadequate notice and oppor-

tunity to comment on the exemption; and (3) classify coke product and fines inadvertently released from saleable piles of coke as hazardous waste. While EPA joined issue on the merits of the environmental petitioners' first two contentions, API, as intervenor with respect to their petition, contends that they lack standing.[2] Essentially, API contends that the environmental petitioners fail to link the harms of which their members complain with the regulatory actions that they wish EPA to take. API and EPA also contend that the court lacks jurisdiction over the environmental petitioners' third contention, regarding coke product and fines, because EPA's decision not to list these substances is a deferral of rulemaking, rather than a final rule. We hold that the environmental petitioners have failed to establish that they have standing to raise their contentions with respect to UGSTS and the coking process exemption, and that EPA's inaction on coke product and fines is not justiciable under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 7006(a). Accordingly, because the court lacks jurisdiction, we dismiss the environmental petitioners' petition.

## A. UGSTS

The environmental petitioners challenge EPA's decision not to list as hazardous waste the sediment found in discarded storage tanks that once held unleaded gasoline, maintaining in general terms that EPA's failure to list this waste as hazardous has placed its members in harm's way. For Article III standing, a petitioner must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* —— U.S. ——, ——, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). An organization has standing to sue "on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

At issue is whether the environmental petitioners' evidence demonstrates that EPA's alleged failings have caused a traceable "concrete and particularized" harm to their members that is "actual or imminent". In *Louisiana Environmental Action Network v. EPA,* 172 F.3d 65 (D.C.Cir.1999) ("*LEAN I*"), the court reiterated that for purposes of standing a petitioner need not establish the merits of a case, i.e., that localized harm has in fact resulted from a federal rulemaking, but rather must demonstrate that there is a "substantial probability" that local conditions will be adversely affected, and thus will harm members of the petitioner organization. *LEAN I,* 172 F.3d at 68 (citing *Florida Audubon Society v. Bentsen,* 94 F.3d 658, 666 (D.C.Cir.1996) (en banc)). In *LEAN I,* petitioners alleged that their members would be adversely affected by a federal rule permitting variances from generally applicable treatment standards for waste prior to landfill disposal. At least three LEAN members lived near the Carlyss landfill where most waste from the state of Louisiana "would be 'land disposed' if excavated and treated. Under LEAN's theory, 'lower quality' (less treated) wastes [would] be deposited in Car-

---

**2.** Because the environmental petitioners do not rely on the Environmental Technology Council ("ETC") or its members for standing, we need not address API's challenge to ETC's prudential standing.

lyss" as a result of the variances. *Id.* at 67. The court held that petitioners had standing:

> Petitioners have noted that in the state of Louisiana there are over 100 inactive or abandoned hazardous waste sites for which cleanup has already been found necessary, as well as about thirty RCRA facilities designated "high priority." It is therefore all but certain that remediation activities will continue to occur apace. Even if the variance-to-remediation ratio is fairly low, the amount of such activities creates a very "substantial probability" that *some* variances will be granted, increasing risk to LEAN members near the Carlyss site.

*Id.* at 68 (citation omitted).

To establish their standing to challenge the non-listing of UGSTS, environmental petitioners rely in part on two affidavits by Michelle McFaddin Atwell, an environmental regulatory affairs consultant. Based on her review of the digital database of the Texas Natural Resources Conservation Commission on industrial hazardous waste shipments, Atwell concluded that "tank bottoms" have been shipped from refineries to a municipal landfill in Sinton, Texas, and that other "Type I" municipal landfills throughout Texas have received "tank bottoms" and "oily sludge waste," including landfills in Houston, Conroe, and Altair. While Atwell never identifies unleaded gasoline tanks generating UGSTS, she explains that standard listing codes preclude specific identification of "unleaded gasoline tanks"; generic codes such as "tank bottoms" and "oily sludge waste" are employed, and encompass numerous wastes, including those generated by unleaded gasoline tanks. Atwell notes that while "Class I industrial, solid waste" generally is supposed to be shipped to "a permitted, Class I industrial waste landfill rather than a Type I, municipal landfill," exemp-

tions from this rule are routinely granted in Texas with respect to those industrial wastes not listed as hazardous, such as UGSTS, and the state conservation commission "rarely if ever track[s] the volumes of waste that are actually shipped to Type I landfills under these case-by-case requests."

Although the environmental petitioners have identified landfills that have a substantial probability of receiving such shipments, *see LEAN*, 172 F.3d at 68, namely, Type I municipal landfills likely to receive wastes within categories that include UGSTS, they have failed to establish either a substantial probability that the shipments to these identified landfills contain UGSTS, or a link between such deposits and the specific harms alleged by their members. *See, e.g., Laidlaw,* —— U.S. at ——, 120 S.Ct. at 704; *Lujan,* 504 U.S. at 560–61 112 S.Ct. 2130; *LEAN I,* 172 F.3d at 68. As to the former, environmental petitioners do not present, for example, either expert opinion that these landfills are of a class substantially likely to receive UGSTS-filled shipments or an affidavit that the effects of UGSTS are evident in the landfill's groundwater. As to the latter, by failing to connect the alleged injuries to UGSTS, the environmental petitioners also have failed to establish a likelihood that the injuries alleged will be redressed by a favorable decision. *See, e.g., Laidlaw,* —— U.S. at ——, 120 S.Ct. at 704; *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130.

■ Much of the environmental petitioners' standing problem arises from the fact that their only affiant who lives in Sinton, which Atwell identified as having a landfill likely to receive UGSTS waste, has not shown that he was a member of a petitioner organization at the time the petition challenging the rule was filed, and his affidavit thus is legally insufficient.[3] *See Petro–Chem. Processing v. EPA,* 866

---

**3.** Herbert H. Coleman's affidavit of August 11, 1999, states that he "recently became a member of the Sierra Club," but does not indicate that he was a member of the Sierra

Club at the time the petition was filed. Although API made this point in its brief, the environmental petitioners did not submit a responsive affidavit.

F.2d 433, 437 (D.C.Cir.1989). The environmental petitioners' other affidavits, involving general concerns about pollution at other locations, do not cure the deficiency.

The affidavits of Tommy C. Douglas and H. C. Clark do indicate that pollution in the Greens Bayou near Houston may be linked to waste from the BFI–McCarty landfill in Houston, which Atwell also identifies as among those landfills that receive "tank bottoms" and "oil sludge waste," and that Douglas no longer canoes in the Bayou as a result of his concerns about pollution. The problem lies, however, in the vagueness of Clark's and Douglas' affidavits. Clark, a geophysicist, states that public records at the Texas Natural Resources Conservation Commission show that contamination in the groundwater under and from the BFI landfill in Houston, including "petroleum related organic chemicals," has migrated into the Greens Bayou. Douglas, a member of a petitioner organization who lives in Houston, states that he no longer canoes on the Greens Bayou because he and other canoers have observed pollution in the Bayou, and because of more general concerns about pollution in the Bayou, based in part upon his knowledge that "there is a landfill just above the location" where he once began a Bayou canoe trip.

While Clark provides a general link between Houston's BFI landfill and the Greens Bayou, and Douglas suggests generally that he is wary of Bayou pollution, neither affiant traces the pollution of concern to UGSTS waste. Clark refers to "petroleum related organic chemicals," but he does not suggest the current or imminent presence of specific chemicals found in UGSTS waste, such as benzene, and none of Clark's statements refer to specific wastes generated from unleaded gasoline storage tanks. Similarly, Douglas does not describe the characteristics of the pollution that he has observed, thus offering no basis to discern whether such pollution, and hence his fears, were substantially likely to have been derived, even in part, from unleaded gasoline storage tanks. Nor does Douglas suggest that his general concerns about current or imminent Bayou pollution, including his knowledge that a landfill exists nearby, are linked to UGSTS waste, or to wastes with features characteristic of UGSTS. While it is hardly necessary to present duplicative evidence of reasonable fears that are fairly traceable, as occurred in *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 153, 157–58, 161–62 (4th Cir.2000) (en banc), Douglas and Clark establish little more than that some types of petroleum-related organic chemicals migrate from BFI's Houston landfill to the Greens Bayou, and that Douglas is concerned generally about pollution in the Bayou. This is insufficient to establish the environmental petitioners' standing because there is no showing that the specific EPA listing determination that they seek would redress Douglas' concerns. *See, e.g., Laidlaw,* —— U.S. at ——, 120 S.Ct. at 704; *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130.

Affiant W. H. Hilton is no more helpful to the environmental petitioners. He states that he owns property in Wilmer and in Ellis County and that municipal landfills "in Texas are allowed to accept significant quantities of industrial wastes including.... Class 1 wastes [such as UGSTS,] even if the [municipal landfill's] permit does not so state," but he does not indicate any current or imminent harm to himself. To the contrary, he states that he organized a successful effort to halt plans for a new municipal waste landfill in Wilmer, and that although at one time he was concerned that his Ellis County property might be devalued in view of the potential expansion of a local municipal landfill and existing groundwater contamination at that landfill, a political effort resulted in a settlement to better protect the groundwater and his property. Hilton also states that a Chevron storage tank leaked on land adjacent to land belonging to his mother-in-law's estate, of which Hilton is co-executor, and that wells had to be

drilled on the estate's land to remedy the resulting water contamination, but Hilton does not identify the circumstances surrounding the leak, including whether it involved landfilled unleaded gasoline tanks or whether any harms suffered by the estate are current or imminent, and hence remediable.[4] *See, e.g., Laidlaw,* —— U.S. at ——, 120 S.Ct. at 704; *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130.

Therefore, in addition to having failed to show the existence or imminent existence of unleaded gasoline storage tanks in the identified Type I landfills, the environmental petitioners fail to trace any harm to their members that flows from the presence of UGSTS in waste streams from the landfills, and thus to establish that their members' concerns are redressable through the listings sought by the environmental petitioners. Because the environmental petitioners have not demonstrated an injury to any of their members that is both traceable to EPA's non-listing decision and redressable by this court, we dismiss the UGSTS portion of their petition for lack of jurisdiction. *See Laidlaw,* —— U.S. at ——, 120 S.Ct. at 704; *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130; *LEAN I,* 172 F.3d at 68.

### B. Coking process exemption: notice and comment claim

 Similar deficiencies exist regarding the environmental petitioners' challenge under the notice and comment requirement of the Administrative Procedure Act, 5 U.S.C. § 553(b) & (c), to EPA's decision not to regulate the solid wastes inserted into the coking process, particularly those used in coke quenching.[5] EPA exempted from regulation those oil-bearing hazardous secondary wastes inserted into the coking process, noting in its final rule that such insertion generally occurs during coke quenching rather than in the conventional coking process. The environmental petitioners challenge this exemption on the ground that EPA failed to provide adequate notice and opportunity for comment because EPA focused on coke quenching only after the initial notice and comment period had closed. We do not address this contention because the environmental petitioners have failed to establish a substantial probability that their affiants will be exposed to coke product quenched with hazardous materials. *See id.*

The environmental petitioners base their standing to raise this contention on the affidavits of Zelda Champion, Frank Gordon, and Dr. Charles Lamb. The Champion and Gordon affidavits show that members of petitioner organizations are exposed to coke product generally, including "fines" (i.e., tiny coke particles). Both affiants state that they live near refineries or coke storage sites, have observed the storage and transportation of coke at such sites, believe that such storage and transportation is inadequately controlled, and have witnessed the release and windblown carriage of coke product and fines from these sites. They also state that they have had such product and fines tested to confirm their identity as petroleum coke

---

4. We need not decide the question of executor standing. Although executors are granted standing to sue on behalf of the deceased owner of the relevant estate, *see, e.g., Nat'l Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1435 (D.C.Cir.1995); *Amato v. Wilentz,* 952 F.2d 742, 751 (3d Cir.1991), such standing generally is based upon a vicarious, third-party representation theory. *In the Matter of Oil Spill,* 954 F.2d 1279, 1319 (7th Cir.1992). Whether such third-party standing could establish associational standing for an organization of which the third party is a member is an open question in this circuit.

5. "Coking," the process through which coke is produced, consists of two primary stages. In the first, or conventional coking stage, heavy oil bearing feedstocks are placed into a coke drum and heated at high temperatures, thus breaking the long-chain hydrocarbon molecules found in the feedstocks, and ultimately producing coke. The second, or "coke quenching" stage, involves the injection of water into the coke drum to quench and cool the coke.

dust.[6] While these affidavits demonstrate exposure by members of environmental petitioners' organizations to coke product and fines, neither Champion or Gordon avers that the coke product and fines to which they are exposed are generated by a coking process into which hazardous secondary materials are inserted, or are substantially likely to be inserted.

As to the coking process itself, the affidavit of Dr. Charles Lamb establishes only that the quenching of coke in waste increases the toxic nature of such coke, and that "the dust from such coke [would contain] increased levels of toxic contaminants." Attached to his affidavit is a report deriving estimates of coke contamination levels that would be expected from the use of specific refinery wastes in coke quenching. Dr. Lamb states that his study showed that "there are refinery wastes which contain [polynuclear aromatics] that would deposit on the surface of coke particles if they were used for coke quenching," and concludes that "[i]t is logical that these contaminants would disproportionately partition to the finer coke particles ... [and that] coke dust emitted from the coke mass would have even higher concentrations of contaminants than indicated previously." But the report notes that "[a] site specific risk assessment would require actual data of emission rates and ambient air concentrations...."

In sum, the environmental petitioners' affidavits establish at most that the insertion of hazardous wastes into the coking process is potentially unhealthy and environmentally unsound, and that coke product and fines from such a process are likewise unhealthy and environmentally unsound. What is missing is an averment that such insertion occurs, or is substantially likely to occur, at the facilities that produce the coke complained of by affiants Champion or Gordon. It is true that Dr. Lamb suggests that there is an economic incentive for coke producers to avail themselves of EPA's exemption and quench coke in hazardous waste, noting that "[w]hile there may be some recovery of fuel values, the overriding incentive for using refinery wastes for coke quenching is to avoid the cost of waste disposal. The coke product can be significantly degraded by waste contaminants added in the quenching step." Such a generalized statement, however, is insufficient to demonstrate a substantial probability that the specific coke product and fines to which members of environmental petitioners' organizations are exposed will be quenched in hazardous waste. While *Laidlaw* may not require very much to constitute a concrete and particularized harm, —— U.S. at ——–——, 120 S.Ct. at 706–07, more is required than the vague statement proffered here. In *Florida Audubon*, the court rejected the argument that a tax incentive to produce a fuel derived from ethanol was substantially likely to generate increased production of ethanol-producing crops, given the "lengthy chain of conjecture," and thus to generate increased agricultural pollution in the specific areas where members of the environmental organization might face harm. *Florida Audubon*, 94 F.3d at 666. While the causal chain in *Florida Audubon* was significantly more attenuated than here, *Florida Audubon* requires some showing of a substantial likelihood that a specific, relevant actor will avail itself of a given incentive. *Id.* at 669. No such showing is made here, as nothing is averred to the effect that hazardous wastes are present, and hence available to quench wastes, at the specific facilities identified by affiants Champion and Gordon, or otherwise to the effect that hazardous waste quenching cur-

---

**6.** It is unclear whether Champion was a member of the Sierra Club at the time the petition was filed, and thus eligible to provide standing for the environmental petitioners. However, the affidavit by Gordon, who was a member of petitioner Citizens for a Better Environment when the petition was filed, is in relevant parts cumulative of Champion's affidavit except as to the location of the facilities each has identified, for Gordon lives in Pittsburg, California, while Champion lives in Corpus Christi, Texas.

rently exists or is substantially likely to exist in those facilities generating coke product to which members of environmental petitioners' organizations are exposed.[7] Consequently, the environmental petitioners have failed to link the practices complained of to alleged harms or imminent harms to their members, and thus have failed to establish that they have standing to raise their coke processing exemption claim. Accordingly, we dismiss the coking process portion of the environmental petitioners' petition for lack of jurisdiction. *See Laidlaw,* —— U.S. at ——, 120 S.Ct. at 704; *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130; *LEAN I,* 172 F.3d at 68.

## C. Wind-blown Coke Product and Fines

 Finally, the environmental petitioners seek review of EPA's decision to defer a listing determination for coke product and fines accidentally released into the air, or otherwise inadvertently released, from saleable piles of coke. Unlike the environmental petitioners' coke quenching challenge, their airborne coke product and fines contention does not relate to the manner in which coke is processed, or to the materials to which the coke is exposed in processing. Rather, this contention concerns the non-listing of those product and fines released from saleable piles of coke, regardless of how the coke is processed. As noted in subpart (B), affiants Champion and Gordon establish a link between coke product and fines emissions generally, and their exposure to such product and fines. Nonetheless, environmental petitioners face another jurisdictional obstacle: the determination they challenge is a deferral of rulemaking, not a final rule.

 Under RCRA § 7006(a), the court has jurisdiction to review three types of actions by EPA: promulgation of final regulations, promulgation of requirements, and the denial of petitions for the promulgation, amendment or repeal of RCRA regulations. *See American Portland Cement Alliance v. EPA,* 101 F.3d 772, 775 (D.C.Cir.1996); 42 U.S.C. § 6976(a) (1995). In determining whether an agency has taken final action the court has looked to a variety of factors, "including the agency's own characterization of its action, publication or lack thereof in the Federal Register or Code of Federal Regulations, and whether the action has a binding effect on the rights of parties, and on the agency's ability to exercise discretion in the future." *American Portland Cement,* 101 F.3d at 776. A decision by an agency to defer taking action is not a final action reviewable by the court. As the court explained in concluding that it lacked jurisdiction under RCRA to review certain regulatory determinations:

> An announcement of an agency's intent to establish law and policy in future is not the equivalent of the actual promulgation of a final regulation. EPA described in detail the areas that will require further analysis before final regulations can be promulgated, signaling that the Regulatory Determination was not intended as the last word on the subject. . . .

*American Portland Cement,* 101 F.3d at 777 (citation omitted).

 The environmental petitioners acknowledge in their initial brief that EPA's failure to list product and fines from coke piles is a "deferral" of a listing determination, but contend nonetheless that it is reviewable under RCRA because EPA lacked discretion to defer this determination under a consent decree entered in *Browner v. EDF,* Civ. No. 89–0598 (D.D.C. Dec. 9, 1994). The environmental petitioners' position has three shortcomings.[8]

---

7. In a supplemental filing on April 5, 2000, the environmental petitioners repeat that hazardous wastes could, under EPA's rule, be inserted into the coking process but do not state that this occurs or is substantially likely to occur at a location referred to in their affidavits, nor that such information cannot be obtained.

8. The environmental petitioners attempted, in their reply brief and at oral argument, to

First, EPA's decision to defer has none of the characteristics of final agency action. In explaining its decision on those product and fines inadvertently discarded from saleable piles of coke, EPA stated it would "defer" making a listing determination because the *Browner* consent decree did not require such a determination and no other factors made such a determination immediately necessary. Final Rule, 63 Fed. Reg. at 42,161. A decision to defer has no binding effect on the parties or on EPA's ability to issue a ruling in the future. *American Portland Cement,* 101 F.3d at 776.

Second, to the extent that the environmental petitioners challenge EPA's interpretation of the consent decree, this court lacks jurisdiction; an action to enforce the consent decree must be brought in the district court that issued the decree, *see* 42 U.S.C. § 6972(a); *Beckett v. Air Line Pilots Ass'n,* 995 F.2d 280, 285–86 (D.C.Cir.1993); *Figures v. Bd. of Public Utilities of Kansas City,* 967 F.2d 357, 361 (10th Cir.1992), even assuming that the environmental petitioners have standing to bring such an enforcement action (for the Environmental Defense Fund was the sole environmental organization in the *Browner* case).[9]

Accordingly, because the court lacks jurisdiction to consider the environmental petitioners' contention regarding EPA's decision to defer listing coke product and fines, we dismiss that portion of their petition for review as well.

---

recast their position to be that EPA's deferral effectively constitutes a final rule insofar as EPA lacked discretion to defer ruling under both the *Browner* consent decree and 42 U.S.C. § 6291(e)(2). Under either characterization, the environmental petitioners' contention fails for the same reasons. Furthermore, counsel for the environmental petitioners stated at oral argument that they are not contending that jurisdiction should be taken on the basis of unreasonable agency delay. *See Tele-* *communications Research and Action Center v. FCC,* 750 F.2d 70, 76 (D.C.Cir.1984).

9. The statute on which the environmental petitioners rely for a "congressional mandate" for an EPA listing determination on coke product and fines, 42 U.S.C. § 6291(e)(2), underlies the *Browner* consent decree litigation with respect to coke product.